[S.F. No. 22990. In Bank. Oct. 19, 1973.]

JAMES M. MOYER, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD and
SOUTHERN CALIFORNIA EDISON COMPANY, Respondents.

**COUNSEL**

Brundage & Roseman and Steven Roseman for Petitioner.

Levy & Van Bourg and William R. Butler as Amici Curiae on behalf of Petitioner.

Franklin Grady, Sheldon C. St. Clair, Thomas J. McBirnie, Grancell, Kegel & Tobin, Sherman Grancell, Stuart J. Liebman and Warren L. Hanna for Respondents.

**OPINION**

**SULLIVAN, J.**—Petitioner James Moyer seeks review of a decision of respondent Workmen's Compensation Appeals Board (Board) following reconsideration. The Board reversed the referee's decision that petitioner's permanent disability rating be determined as of the date of injury and concluded instead that since petitioner had participated in a rehabilitation program initiated by the employer under section 139.5 of the Labor Code,[1]

[1]Section 139.5 of the Labor Code as it read at the time of the Board's decision provided: "The administrative director [of the Division of Industrial Accidents] may establish within the Medical Bureau of the Division . . . a rehabilitation unit, including an appropriate professional staff, to foster, review, and approve rehabilitation plans, and to expedite and facilitate the carrying out of rehabilitation plans. . . .

"The initiation of a rehabilitation plan shall be by the employer or insurance carrier. If the employer, the insurance carrier, or the injured workman disagree as to the establishment of a rehabilitation plan either may consult with the rehabilitation unit or may seek an advisory determination by the rehabilitation unit which may make an advisory determination that such services are necessary or advisable.

"Any plan initiated by an employer or insurance carrier shall be presumed to be necessary and meritorious.

"Injured workmen may agree with their employers or the insurance carriers for insured employers upon rehabilitation programs without submission of such programs for approval.

"Where an employer or insurance carrier fails or refuses to initiate a rehabilitation plan for an injured workman, or fails or refuses to participate in a plan previously

his rating must be determined with reference to his age and occupation at the time such determination is made.

On February 27, 1968, petitioner, while employed as a lineman in Lancaster by respondent Southern California Edison Company (Edison), a permissibly self-insured employer, sustained an industrial injury to his back.[2] He underwent surgery and was eventually discharged to resume work upon the condition that his activities not require lifting of weights over 50 pounds. Except for a brief period in August 1968, petitioner did not return to work with Edison until December 1968. Unable to handle the duties of a lineman, he was given the job of meter reader by Edison at substantially less wages.

In March 1969, petitioner suffered another industrial injury which required further back surgery. (See fn. 2, *ante.*) Thereafter, Edison attempted to place him in a different occupation. In October 1969, while totally disabled from the subsequent injury, he received a telephone call from an employee of Edison requesting that petitioner submit himself to tests designed to determine his fitness for rehabilitation in a new occupation. He completed a series of written tests and in February 1970, attended an eight-day

---

initiated and agreed to by such employer or insurance carrier, such failure and refusal shall be deemed to be final.

"Where a rehabilitation plan has been found to be necessary and meritorious, and the injured workman thereafter refuses to undertake and participate in such plan found to be reasonable and meritorious, in absence of his acceptance thereof such refusal shall be deemed to be final.

"Upon undertaking a rehabilitation program the injured workman shall continue to receive temporary disability indemnity and in addition shall receive the sum of fifty-two dollars and fifty cents ($52.50) [now $70.00] per week as an advance on permanent disability indemnity. Such advance is limited to 26 weeks, but this shall not limit the right of the employer or insurance carrier to continue the rehabilitation plan and advances for a longer period. Such advance shall be credited in full against the permanent disability indemnity determined to be due to such employee for his permanent disability rating when established, up to the extent of the permanent disability indemnity so found and determined. *The determination of the employee's permanent disability percentage in such case shall be with reference to his age and occupation at the time that such determination is then made.*

"*The initiation of a rehabilitation program or the acceptance thereof shall be voluntary and not be compulsory on the employer, the insurance carrier or the injured workman.*" (Italics added.)

Hereafter, unless otherwise indicated, all section references are to the Labor Code.

[2]Petitioner filed three other claims for industrial injuries to his back and left leg, assertedly suffered on February 28 and August 7, 1968, and March 17, 1969, the latter injury resulting in a permanent disability rating, after apportionment (40 percent), of 8½ percent. However, the instant dispute concerns only the injury suffered on February 27, 1968, which, after apportionment (60 percent), was given a permanent disability rating of 20 percent, if determined as of the date of the injury, or 9¼ percent, if based on petitioner's age and occupation after rehabilitation.

training program in Long Beach in order to learn the skills of an assistant in computer programming.[3]

Upon the conclusion of his training program, petitioner continued working for Edison in Long Beach and received compensation for lodging and meals during a 90-day probationary period. At the end of this period, he moved to Long Beach, his new place of employment. He was reimbursed by Edison for his moving expenses. His wages as an assistant in computer programming, though substantially less than what he had received as a lineman, were slightly more than his wages as a meter reader.

The evidence is undisputed that although petitioner was advised that he was to be trained in a new occupation he was not informed by Edison, nor was he aware at any time prior to commencement of the training program, that his permanent disability rating for injuries suffered on February 27, 1968, would be determined with reference to his age and occupation *after rehabilitation* rather than as of the date of injury.

Petitioner filed with the Board an application for adjustment of claim and after a hearing was awarded a permanent disability indemnity of $4,200 based on a rating, after apportionment, of 20 percent. He contended, among other things, that within the meaning of section 139.5, he had not voluntarily accepted a rehabilitation program because he had not been informed by Edison, nor was he aware, that his participation in Edison's rehabilitation program required that he be permanently rated on his age and occupation at the date of the rating, rather than at the date of his injury. The referee, agreeing with petitioner, stated, "There is no evidence that the applicant agreed to the rehabilitation program in accordance with Labor Code Section 139.5. It is therefore inapplicable [in determining petitioner's disability rating.]"[4]

---

[3]Although section 139.5 provides that in addition to payment of temporary disability benefits, an employee is entitled to payment or permanent disability "[*u*]*pon undertaking* a rehabilitation program . . . as an advance on permanent disability indemnity," (italics added) the record reflects that Edison did not commence advance payments until some time after petitioner completed his probationary period of employment.

[4]Apparently, the referee was persuaded by a memorandum submitted by R. A. McLeod, special consultant in rehabilitation for the Division of Industrial Accidents, which reviews rehabilitation plans undertaken by private industrial employers. (See § 139.5.) The memorandum states in part: "The following conditions have been established by the Rehabilitation Unit of the Division of Industrial Accidents as being necessary in all programs.

"1. The insurance carrier or self-insured employer must participate in the initiation of the rehabilitation program.

"2. The insurance carrier or self-insured employer will develop the plan and offer it to the employee on a voluntary basis.

"3. The insurance carrier or self-insured employer must reach an agreement with

Upon reconsideration, the Board, relying on one of its unreported opinions which held that section 139.5 does not require an employee to be given notice of the possibility of a reduced rating after rehabilitation,[5] reversed the referee's decision and directed that petitioner's permanent disability rating be ascertained with reference to his new occupation as an assistant in computer programming and to his age at the time of the rating. The Board also rejected petitioner's argument that a reduction of disability benefits, without prior notice and a hearing, constituted a violation of procedural due process. Petitioner was awarded a permanent disability indemnity of $1,942.50 based on a rating, after apportionment, of 9¼ percent.

Petitioner filed the instant petition for writ of review seeking to annul the Board's decision. His somewhat overlapping contentions may be summarized as follows: (1) That petitioner did not voluntarily accept Edison's rehabilitation program since he was not apprised that his retraining would result in a different or lesser rating and that he had an election to participate in the rehabilitation and take a lesser sum or to not participate and receive his regular and higher rating; and (2) that if section 139.5 should be allowed to take effect when the employer has not informed the employee

---

the injured employee (preferably in writing) covering the following facts: [¶] (a) State the nature of the retraining program and its objectives, showing the contrast between the former occupation and the new one for which he is preparing. [¶] (b) Show the starting date of the program and the length of time it is to continue. [¶] (c) Show where the training is to be provided and by whom. Identify the job classification for which the training prepares the employee. [¶] (d) Show the total cost of the program and indicate by whom the various parts of the program are to be paid. [¶] (e) Agree to continue temporary disability benefits for the entire period of retraining. [¶] (f) Agree to make advances on permanent disability benefits at $52.50 per week concurrently with the payment of temporary disability for the length of the program for a minimum of 26 weeks. (Further advances are encouraged if the size of the expectant permanent disability warrants it.) [¶] (g) *The insurance carrier or self-insured employer should advise the employee that in consideration of the above benefits, he will be rated at his new occupation and age following completion of the rehabilitation program.*

". . . . . . . . . . . . . . . . . .

"If all of the above criteria are met, I approve the program at the start. A file report is submitted to me at the completion of the program and that report covers placement in the new job as well as the conditions previously reported.

"If all conditions have been met satisfactorily, I then notify the parties of my approval of the successfully completed rehabilitation program.

"Occasionally, cases are submitted for the establishment of an informal and permanent disability rating on which credit under Labor Code section 139.5 is requested. The rating specialist submits these cases to me to determine if conditions were met. Basically, I use the above criteria to advise the specialist whether or not the employer [sic] should be rated for occupation and age." (Italics added.)

[5]Ingram v. Southern California Edison Company (Case No. POM 10793.)

that he will receive a lesser rating as a result of participating in the employer's rehabilitation program, the section will violate the due process clauses of the United States Constitution and of the California Constitution and will also violate section 3202.

Petitioner asserts that section 139.5 is inapplicable because he was not aware that his acceptance of rehabilitation would result in a reduced permanent disability rating. Focusing on the last paragraph of section 139.5 (see fn. 1, *ante*), which provides that "acceptance" of a rehabilitation program "shall be voluntary and not be compulsory on the . . . injured workman," petitioner asserts that a voluntary acceptance can occur only if such action is taken with full knowledge of its consequences. Because he was not aware that completion of the training program as an assistant in computer programming would affect his disability rating, petitioner contends that his apparent assent to undertaking vocational training did not constitute a voluntary acceptance of a rehabilitation program under section 139.5.

Edison on the other hand argues that the term "voluntary" refers only to freedom from compulsion and that it "simply means that an employee cannot be compelled to participate in a rehabilitation program which trains him for a position or type of work which he feels he would not enjoy." Pointing to a lack of evidence that petitioner was compelled to enter the training program, Edison contends that petitioner's disability rating must be ascertained in accordance with the provisions of section 139.5. Additionally, Edison argues that the section does not expressly require that notice of the consequences of rehabilitation on disability ratings be given an employee and that to require such notice would discourage injured employees from undertaking rehabilitation, thereby defeating the purpose of the statute.

The pivotal question which we face is that: Must the employee before accepting the employer's rehabilitation program be aware of the consequences of his doing so in order for his acceptance to be deemed voluntary? Essentially our task is to interpret the provision of section 139.5 that "acceptance [of a rehabilitation program] shall be voluntary and not be compulsory" and more particularly to determine the meaning of the word "voluntary" in the context of that provision. In carrying out this task we "must, however, presume that the Legislature intended to enact a valid statute; we must, in applying the provision, adopt an interpretation that, consistent with the statutory language and purpose, eliminates doubts as to the provision's constitutionality. [Citations.]" (*In re Kay* (1970) 1 Cal. 3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]; see also *San Francisco*

*Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669], cert. den. 401 U.S. 1012 [28 L.Ed.2d 549, 91 S.Ct. 1266]; *Erlich* v. *Municipal Court* (1961) 55 Cal.2d 553, 558 [11 Cal.Rptr. 758, 360 P.2d 334].) ■ As will appear, in accordance with this principle, we interpret the word "voluntary" to mean that the employee's acceptance of rehabilitation must be with his knowledge of the consequences. We therefore need not discuss the constitutional issues raised by petitioner. ■■■ We also reject at the start as without merit petitioner's claim that the provision under examination conflicts with section 3202.[6]

■ We begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) ■ In determining such intent "[t]he court turns first to the words themselves for the answer." (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182, [217 P.2d 1], cert. den. 340 U.S. 879 [95 L.Ed. 639, 71 S.Ct. 117].) ■ We are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." (*In re Alpine* (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500]; see also *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; *Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 203 [339 P.2d 801], disapproved on another ground in *Petri Cleaners, Inc.* v. *Automotive Employees, etc. Local No. 88,* 53 Cal.2d 455, 473-475 [2 Cal.Rptr. 470, 349 P.2d 76].) ■■ "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." (*Select Base Materials* v. *Board of Equal., supra,* 51 Cal.2d 640, 645); "a construction making some words surplusage is to be avoided." (*Watkins* v. *Real Estate Commissioner* (1960) 182 Cal.App.2d 397, 400 [6 Cal.Rptr. 191].) ■ "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9]; see also *West Pico Furniture Co.* v. *Pacific Finance Loans* (1970) 2 Cal.3d 594, 608 [86 Cal.Rptr. 793, 469 P.2d 665].) ■ Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.

---

[6]Section 3202 provides: "The provisions of Division 4 and Division 5 of this code shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." Since section 139.5 is contained in division 1 of the Labor Code, section 3202 manifestly does not apply to it.

(*Select Base Materials* v. *Board of Equal., supra,* 51 Cal.2d 640, 645; *Stafford* v. *L. A. etc. Retirement Board* (1954) 42 Cal.2d 795, 799 [270 P.2d 12].)

With these principles in mind we first turn to probe the meaning of the word "voluntary." It is defined as "proceeding from the will: produced in or by an act of choice," or "of or relating to will." (Webster's Third New Internat. Unabridged Dict. (1961) p. 2564; see also 92 C.J.S., Voluntary, pp. 1029-1031.) This definition appears to support Edison's position that the term merely means an exercise of will, i.e., it "implies freedom from any compulsion that could constrain one's choice." (Webster's, *op. cit. supra,* p. 2564.) In connection with the above definition of "voluntary," reference is made to a synonym "deliberate," implying the "idea of *full knowledge* or *full consciousness* of the nature of the intended action." (*Ibid.*, italics added.) "Deliberate" in turn is defined as "characterized by or as resulting from unhurried, careful, thorough, and cool calculation and consideration of effects and consequences . . . ." (*Id.* at p. 596.) Thus, the definition of "voluntary" in the sense of being "deliberate" appears to support petitioner's position that an acceptance of a rehabilitation program is not voluntary unless it occurs with full knowledge of the consequences. In sum, the word "voluntary" is reasonably susceptible of more than one meaning.

The legislative history of the statute lends little assistance in determining which of the two meanings the Legislature intended the term to have. Its enactment was prompted by a recommendation of the Workmen's Compensation Study Commission (created by statute, § 6200 et seq.; repealed by Stats. 1968, ch. 109, § 6) that "injured workers have a right to such medical rehabilitative services and such vocational rehabilitative services as may be reasonably necessary to restore the worker to suitable employment . . . ." (Report of the Workmen's Compensation Study Commission (Apr. 1965) ch. IX, Rehabilitation, p. 222.) The commission also proposed that a "worker . . . be required to accept the plan and cooperate in carrying it out"; and further, that the worker's nonacceptance of a rehabilitation plan, where "unreasonable," should result in suspension of further indemnity. (*Id.* at p. 223.) The Legislature rejected these recommendations; instead, it adopted a statute that requires neither the employer nor his injured employee to undertake rehabilitation.[7] The com-

---

[7]Several of the provisions in section 139.5 appear to imply that there are adverse consequences where an injured worker refuses to undertake a rehabilitation program and appear, therefore, to be inconsistent with the last paragraph of the section providing that "acceptance" of rehabilitation shall be "voluntary and not be compulsory on the employer, the insurance carrier or the injured workman." For example, the

mission's report, therefore, provides no direct clue to the meaning of the term.[8]

We must therefore consider the general purpose of the statute. We do this because of our obligation to construe the language of a statute "so as to effectuate the purpose of the law" (*Select Base Materials v. Board of Equal., supra,* 51 Cal.2d 640, 645) and in conformity with a well-settled principle of statutory construction that " 'the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to avoid absurdity or to prevent injustice.' [Citation.]" (*People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543-544 [72 Cal.Rptr. 790, 446 P.2d 790].)

The objective sought to be achieved by section 139.5 is to promote the rehabilitation of the injured workman, that is, to "restore the worker to suitable employment." (Report of the Workman's Compensation Study Commission, *supra,* p. 222.) Rehabilitation has been defined as "[1] those medical and paramedical techniques designed to get a disabled worker from 'the bed to the job' . . . and [2] vocational training." (Report of the Workmen's Compensation Study Commission, *supra,* p. 209, fn. omitted; see also 1 Hanna, Cal. Law of Employee Injuries and Workmen's

section states, "If the employer, the insurance carrier, or the injured workman disagree as to the establishment of a rehabilitation plan either may consult with the rehabilitation unit or may seek an advisory determination by the rehabilitation unit which may make an advisory determination that such services are necessary or advisable." However, "[a]ny plan initiated by an employer or insurance carrier shall be presumed to be necessary and meritorious." On the other hand. "[w]here an employer or insurance carrier fails or refuses to initiate a rehabilitation plan . . . such failure and refusal shall be deemed to be final. [¶] Where a rehabilitation plan has been found to be necessary and meritorious, and the injured workman thereafter refuses to undertake . . . such plan . . . such refusal shall be deemed to be final." However, since the section provides no adverse consequences for a failure to accept a rehabilitation plan, these quoted provisions appear to merely establish when the usual factors of permanent disability are to be used (Lab. Code, § 4660, subd. (a) ), rather than those stated in section 139.5.

[8]Language nearly identical to the last paragraph of section 139.5 is contained in section 6208, which is applicable only to *public* employees who have agreed upon a plan of rehabilitation. (See Lab. Code, § 6200 et seq., "Retraining and Rehabilitation" of public employees.) However, the legislative history of that section also fails to reveal the intended meaning of the language contained therein.

Compensation (2d ed.) § 2.07 [4][a], p. 2-45; 2 Larson, Workmen's Compensation Law (1970 ed.) § 61.20, p. 88-262.)[9] "Conceptually, rehabilitation embraces both physical and vocational restoration." (Note (1965) 19 Rutgers L.Rev. 401, 404, fn. omitted.)

It is obvious that the furthering of the injured worker's rehabilitation subserves the primary purpose of the workmen's compensation laws. These laws are the response to the constitutional authority for the creation and enforcement of a complete system of workmen's compensation. The Constitution carefully specifies that such a complete system includes among other things "adequate provisions for the comfort, health and safety and general welfare of any and all workmen and those dependent upon them for support to the extent of relieving from the consequences of any injury or death incurred or sustained by workmen in the course of their employment . . . full provision for such medical, surgical, hospital and other remedial treatment as is requisite to cure and relieve from the effects of such injury . . . full provision for otherwise securing the payment of compensation . . . ." (Cal. Const., art. XX, § 21.) This court has also observed on a number of occasions that the "primary purpose of industrial compensation is to insure to the injured employee and those dependent upon him adequate means of subsistence while he is unable to work and also to bring about his recovery as soon as possible in order that he may be returned to the ranks of productive labor. By this means society as a whole is relieved of the burden of caring for the injured workman and his family, and the burden is placed upon the industry." (*Union Iron Wks.* v. *Industrial Acc. Com.* (1922) 190 Cal. 33, 39 [210 P. 410].) The underlying policy of these constitutional and statutory provisions as well as the recurrent theme of countless appellate decisions on the matter has been one of a pervasive and abiding solicitude for the workman. Indeed all the specified objectives found in the above section of the Constitution "are expressly declared to be the social public policy of this State . . . ." (Cal. Const., art. XX, § 21.)

In view of the particular objective of section 139.5 and its relationship to the policy and overall purpose of the workmen's compensation laws which have been established for the protection, relief, and general welfare of the workman, we are satisfied that in the provision of section 139.5 here under examination, the Legislature intended to use the word "voluntary" in the sense advocated by petitioner rather than in the sense

---

[9]For the meaning of "vocational rehabilitative services," provided by the Department of Rehabilitation in a publicly funded program designed to assist disabled persons of employable age, see Welfare and Institutions Code section 19150.

urged by Edison. We think that in the phrase "the acceptance [of the rehabilitation program] shall be voluntary," an interpretation of "voluntary" to mean not only a *willing* acceptance but an *intelligent* one is more promotive of the purpose of the section and of the compensation laws in general since it is more promotive of the welfare of the injured workman. We do not see how the injured workman can intelligently decide whether or not to participate in a rehabilitation program unless he is aware of the consequences of that decision. He must appraise not only the advantages of the program but also its disadvantages. What appears at first blush to be an attractive program of training which will "restore the worker to suitable employment" (see fn. 9 and accompanying text) may be substantially offset by a markedly reduced permanent disability rating. Only if he has knowledge of the consequences of his acceptance of the program will the worker be able to balance the disadvantages against the advantages and to make a considered judgment of the net benefit, if any, to him.

This interpretation gives significance to every word of the phrase "acceptance [of a rehabilitation program] shall be voluntary and not be compulsory." (§ 139.5; see *Select Base Materials* v. *Board of Equal., supra,* 51 Cal.2d at p. 645.) If we say that the term "voluntary" connotes a willing act but fails to imply a knowing act, the word "compulsory," having the same meaning, is redundant. Therefore, we believe that the construction we have adopted avoids making the term "not compulsory" mere surplusage.. (*Watkins* v. *Real Estate Commissioner, supra,* 182 Cal.App.2d at p. 400.)

We are not persuaded by Edison's claim that this construction will defeat, rather than promote, the purpose of the statute. It is urged that if an injured employee must be made aware of the consequences of a proposed rehabilitation program, he will be disinclined to participate in it. This reluctance to accept rehabilitation may be explained, in part, by the provision in section 139.5, requiring that after the injured workman has participated in a program, his permanent disability rating must be determined with reference to his age and occupation after rehabilitation. Invariably, the result will be a reduced permanent disability rating.[10]

---

[10]It is conceivable that a rating determined with reference to a new occupation, if given a higher occupational variant, might result in an increased disability rating. This result is improbable, however, since the injured worker would more likely be trained in a new occupation where his disabled condition would be of lesser impairment. In this instance, a lower occupational variant would be assigned, thereby resulting in a decreased disability rating. (For the factors used in evaluating permanent disability, see Lab. Code, § 4660, subd. (a); Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1963) § 17.5.)

It appears to us that this provision is intended to furnish incentive for employers, who bear the cost of compensating injured employees, to initiate rehabilitation programs for their injured employees. Larson states: "[U]sually a rule that forms an incentive for the employee forms a disincentive for the employer, and vice versa. Moreover, if one or the other is under a disincentive, it may be difficult in practice to make rehabilitation effective. To take the most obvious example: If after a worker is restored to some earning capacity by rehabilitation, his compensation is reduced by the amount of his earnings, his financial incentive to make the efforts required for rehabilitation is largely destroyed; yet if full benefits continue to be paid to him as if he were not earning, the financial incentive to the employer to put up the money necessary for the rehabilitation is equally destroyed." (2 Larson, Workmen's Compensation Law, *supra,* § 61.20, p. 88-265; see also Note, *supra,* 19 Rutgers L.Rev., at p. 405.)[11]

Commentators on the subject of rehabilitation have described the apparent reluctance of injured employees to undertake vocational training. It has been said that "most employees are undergoing great financial hardships during the rehabilitation period" because temporary disability benefits paid to an injured employee are less than pre-injury wages. (Note (1972) 9 San Diego L.Rev. 962, 977, fn. omitted.) Additionally, it is stated that an "employee is faced [not only] with a lower permanent disability award if he rehabilitates [but also] the possibility of not attaining employment as a rehabilitant [or] lower wages due to his status as a rehabilitant . . . ." (*Id.* at p. 978.) Despite the difficulties confronting an injured workman, his best interests may be served if he undertakes rehabilitation. (See Cal. Workmen's Compensation Practice (Cont.Ed.Bar), *supra,* § 2.2, pp. 34-35.)

Whatever may be the reluctance of an injured workman to undertake a rehabilitation program, Edison's argument is unconvincing. Such reluctance may be based on factors other than a reduced permanent disability rating. It may be that the injured workman, confronted with the task of balancing one of the consequences of participating in a rehabilitation program, a reduced disability rating, against other beneficial results, such as restoration to an employable skill, would opt for the latter. The imponderable character of Edison's argument, therefore, compels its rejection.

We observe further that although we are not impelled by legislative mandate to liberally construe section 139.5 (see fn. 6, *ante*), we think the interpretation of the word "voluntary" we have adopted not only makes good

---

[11]See also Rehabilitating the Disabled Worker—A Platform for Action (1963) Report of the National Institute on Rehabilitation and Workmen's Compensation, chapter V, Structuring Cash Benefits to Provide Incentive for Rehabilitation.

sense in the context of the workmen's compensation laws but also promotes their constitutionally declared objectives. (See Cal. Const., art. XX, § 21.)

We make a final observation. Section 139.5 does not expressly require that an employer give notice to an injured workman that acceptance of a rehabilitation program will cause his permanent disability rating to be determined with reference to his age and occupation after rehabilitation. It is not within our province to insert in the section what has thus been omitted. (Code Civ. Proc., § 1858; *Seaboard Acceptance Corp.* v. *Shay* (1931) 214 Cal. 361, 365-366 [5 P.2d 882].) Nevertheless the inescapable fact remains that unless the injured workman has knowledge of this consequence, his acceptance of a rehabilitation program is not *voluntary* in the sense that we now construe it. ▮▮▮ We conclude, therefore, that the risk that the injured employee may be unaware of this consequence must fall on the employer or his carrier who seeks to obtain the advantage provided in the section for a reduction in the workman's permanent disability rating. In the case at bench, it is undisputed that petitioner was unaware of such consequence. We therefore conclude that the provisions of section 139.5 do not apply to him.

The decision of the Board is annulled and the case is remanded for further proceedings consistent with the views stated herein.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., and Clark, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the decision for the reasons expressed by Mr. Justice Bray in the opinion prepared by him for the Court of Appeal in *Moyer* v. *Workmen's Compensation Appeals Board* (Cal. App.) 105 Cal.Rptr. 767.