[Civ. No. 59080. Second Dist., Div. Five. Mar. 11, 1981.]

JULIUS GOLDMAN'S EGG CITY, Plaintiff and Respondent.
AIR POLLUTION CONTROL DISTRICT
OF VENTURA COUNTY, Defendant and Appellant.

COUNSEL

Dorothy L. Schechter, County Counsel, and Gary Byron Roach, Assistant County Counsel, for Defendant and Appellant.

David Nawi, Leslie M. Krinsk, Christine A. Sproul, Susan Durbin and W. Thomas Jennings as Amici Curiae on behalf of Defendant and Appellant.

Cohen, England, Whitfield & Osborne, Theodore J. England and Robert J. Muehlenweg for Plaintiff and Respondent.

OPINION

KAUS, P. J.—The Air Pollution Control District of Ventura County (APCD) issued an abatement order prohibiting Egg City from operating an underground fuel storage tank and a manure drying machine until permits had been obtained as required under APCD regulations established pursuant to Health and Safety Code section 42300 et seq. Egg City claimed to be exempt from the permit requirement under Health and Safety Code section 42310, subdivision (e), and sought a writ of mandate (Code Civ. Proc., § 1094.5), commanding APCD to set

aside its abatement order. A peremptory writ was issued and APCD appeals.

FACTS

Egg City is a large egg ranch covering about 300 acres in Ventura County, roughly 4 miles north of Moorpark. The facility houses over 3 million chickens which produce over 2 million eggs per day. The chickens also produce daily between 350 and 400 tons of manure. The manure is handled in 2 ways: about 90 percent is spread for drying over a 25-acre spreading ground and then sold as fertilizer to local farmers; the remaining 10 percent is trucked from the hen houses to the manure dryer.

The manure dryer, for which APCD sought to require a permit, is housed in a building on Egg City grounds. In the dryer, the raw manure is first moved by a twin screw auger to a 60-foot predryer tunnel. Then it is agitated by paddles and conveyed to a plate dryer which resembles a large frying pan. The plate dryer is about 78 feet long and heated from the bottom by 16 burners. After drying, the manure is removed from the plate dryer by an auger which leads to a shaker with a one-half inch mesh screen; the shaker removes clumps, bones, and other materials and recycles them. The materials to be recycled are returned via a recycle auger and go back through the dryer.

Some of the dried manure is stored in an overhead storage bin and eventually goes into a bagging machine; the remainder is stacked in bulk piles. The gases from the plate dryer and the bypass from the predryer tunnel are incinerated by a fume incinerator or afterburner which operates at 700 degrees Fahrenheit. APCD would require Egg City to operate the afterburner at 1,300 degrees Fahrenheit, or to demonstrate equivalent efficiency at another temperature.

Manure drying is a substantial operation at Egg City. The dryer normally operates eight hours per day, although its operation depends on the demand for its product. Output is about two tons of dried manure per hour, with a value of $70 per ton as fertilizer and cattle feed—about $1,120 per day.

The other piece of equipment for which APCD has sought to require a permit is a 9,950-gallon underground fuel tank located on the Egg City ranch. The tank is used to store fuel for Egg City vehicles.

*Procedure*

Egg City initially complied with APCD's request that it seek permits for various pieces of equipment, including the manure dryer and the fuel tank. Soon, however, Egg City came to believe that the equipment was exempt from the permit requirements under Health and Safety Code section 42310, subdivision (e), which provides that no permit is required for "[a]ny equipment used in agricultural operations in the growing of crops or the raising of fowl. . . ."

Egg City requested a clarification from APCD before proceeding further with the permit process; APCD maintained that permits were required.

On June 7, 1979, Egg City filed a complaint for declaratory relief in Ventura County Superior Court seeking a judicial determination as to the scope of the exemption provided in section 42310, subdivision (e). On June 22, 1979, while the declaratory relief action was pending, APCD filed a petition for abatement of operation of certain Egg City equipment, including the manure dryer and fuel tank; the abatement hearing took place before the Ventura County Air Pollution Control District Hearing Board on July 9, 1979. In addition to representatives of Egg City and APCD, a number of private citizens testified at the hearing; all complained of nauseating odors emanating from Egg City. However, it remained unclear whether the odors were coming from machinery or from the 25-acre manure drying field.

The hearing board issued its order on July 20, 1979. Although certain·pieces of equipment were held exempt from the permit requirements, the manure dryer and the fuel storage tank were held subject to the permit requirements, and their operation was ordered abated until permits had been obtained.

On August 21, 1979, Egg City filed a petition for writ of mandate (Code Civ. Proc., § 1094.5), requesting that the abatement order be set aside. The declaratory judgment and mandate actions were then consolidated and trial was held on October 22, 1979. On December 14, 1979, the court issued its judgment and writ of mandate; it found that APCD had abused its discretion in issuing the abatement order because the manure dryer and fuel storage tank were equipment used in agricultural operations in the raising of fowl and therefore exempt from the permit requirements of Health and Safety Code section 42300 et seq.

On January 21, 1980, APCD filed its notice of appeal from the judgment granting the peremptory writ of mandate.

## DISCUSSION

APCD contends on appeal that both the manure drying machine and the underground fuel storage tank are subject to permit requirements because neither item is "equipment used in agricultural operations in . . . the raising of fowl . . . ." (Health & Saf. Code, § 42310, subd. (e)).

Exceptions in a statute are to be strictly construed. (*City of National City v. Fritz* (1949) 33 Cal.2d 635, 636 [204 P.2d 7].) The statute involved here provides a handful of fairly narrow exceptions to the permit system for enforcement of air pollution control standards established in Health and Safety Code section 42300 et seq.[1] As relevant, the operative language exempts from permit requirements "equipment used in agricultural operations in . . . the raising of fowl . . . ." In construing this exemption, we are mindful of the rule that "[w]e are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.]" (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Thus we must determine whether the manure dryer and the fuel storage tank are used in agricultural operations in the raising of fowl according to the ordinary meaning to those words. This is no easy task, inasmuch as Egg City's highly modernized facilities do not square with the commonplace image of chicken farming. Nevertheless, we have concluded that the fuel storage tank is entitled to the permit exemption, but that the manure dryer is not.

### The Manure Dryer

■ The manure dryer is a collection of sophisticated machinery designed to transform chicken manure into cattle feed and fertilizer. Egg City argues that the dryer is used in the raising[2] of fowl because it

---

[1] Unless otherwise noted, all statutory references are to the Health and Safety Code.

[2] The record clearly indicates that chicks are hatched and brought to maturity at separate ranches Egg City maintains in Arroyo Grande and Nipomo, and are only brought to the Moorpark facility as mature laying hens. Thus it appears that the chickens at Egg City are properly described as being "boarded," or "employed" there. Nevertheless, the parties have assumed throughout these proceedings that Egg City "raises" fowl at its Moorpark ranch.

is used to dispose of some of the mountainous daily accumulation of chicken manure, and manure disposal is an integral part of fowl raising.[3] The issue cannot be handled so easily. We agree that Egg City must dispose of the massive manure produced by its chickens, but this does not necessarily mean that the dryer is exempted as "equipment used in...the raising of fowl..." where, as here, it is not just an incidental part of the poultry operation, but a major step in converting the manure into a valuable commercial product.

Analogies from other statutes are helpful. In *Farmers Irrigation Co. v. McComb* (1949) 337 U.S. 755 [93 L.Ed. 1672, 69 S.Ct. 1274], the issue was whether certain employees of a farmer-owned mutual ditch company, the sole purpose of which was to distribute irrigation water to its owners, were exempt from the provisions of the Fair Labor Standards Act (29 U.S.C. § 201 et seq.). The company claimed that the employees were exempt under 29 United States Code section 213 (a)(6) as employees "employed in agriculture." The court held that the exemption did not apply, although it conceded that the work performed by the company's employees was necessary to agricultural production. "[F]unctions which are necessary to the total economic process of supplying an agricultural product become, in the process of economic development and specialization, separate and independent productive functions operated in conjunction with the agricultural function but no longer a part of it. Thus, the question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity. The farmhand who cares for the farmer's mules or prepares his fertilizer is engaged in agriculture. But the maintenance man in a power plant [fn. omitted] and the packer in a fertilizer factory [fn. omitted] are not employed in agriculture, even if their activity is necessary to farmers and replaces work previously done by farmers. The production of power and

---

[3]Actually, Egg City has generally *assumed* that the manure dryer is used in the raising of fowl and has focused its attention on whether the dryer and the fuel tank are used in agricultural operations. For the reasons stated in our opinion, the "agricultural operations" issue is irrelevant to the dryer, though not to the fuel tank.

the manufacture of fertilizer are independent productive functions, not agriculture." (337 U.S. at pp. 761-762 [93 L.Ed. at pp. 1679-1680].)[4]

Closer to home we find *Fraenkel v. Bank of America* (1953) 40 Cal.2d 845 [256 P.2d 569]. There the question arose whether a particular contract to erect a grain elevator was exempted from the provisions of the state contractor's license law because the construction was "incidental to...farming, [or] agriculture,..." (Bus. & Prof. Code, § 7049.) After reviewing the authorities relating to the agricultural exemption at some length the Supreme Court held that it applied only if the elevator was incidental to a farmer's own farming operations, but not if it was designed to function as a commercial enterprise.

We think that a dryer which produces $1,120 worth of cattle feed and fertilizer per day is not just incidental to Egg City's fowl raising operation, but is primarily a substantial part of a separate commercial enterprise. It is therefore not entitled to the exemption from permit requirements provided in section 42310, subdivision (e).

### The Fuel Storage Tank

■ The 9,950-gallon underground fuel storage tank is used to hold fuel for Egg City's farm vehicles, including feed trucks, manure trucks and tractors.[5] These vehicles are used in Egg City's agricultural fowl-raising operations; we think that in fueling the vehicles, the storage tank is "used in agricultural operations in the raising of fowl."

APCD argues that while the fuel storage tank may be used in conjunction with equipment used in agricultural operations, the storage tank itself does not constitute such equipment, because it is not directly used in the fowl-raising operation. Nothing in the language of section

---

[4]In one of the omitted footnotes the Supreme Court refers to *McComb v. Super-A Fertilizer Works* (1st Cir. 1948) 165 F.2d 824. In that case it was held that employees of a fertilizer manufacturer whose products were sold to local farmers were not exempted under the act, even if the manufacture of the fertilizer was considered necessary to the farmers' production.

[5]On July 9, 1979, the date of the abatement hearing, the tank held an undisclosed grade of gasoline and it is unclear from the record what types of vehicles were fueled from the tank up to that date. It is clear, however, that from July 10, 1979, forward, the tank has held diesel fuel which is used in the vehicles described in the text.

42310, subdivision (e) requires that, to be exempt, a piece of equipment must be used *directly* in the appropriate agricultural operations. So long as the equipment is used in the operations, the exemption applies.

An analogous situation was presented in *Cedars of Lebanon Hosp.* v. *County of L.A.* (1950) 35 Cal.2d 729 [221 P.2d 31, 15 A.L.R.2d 1045]). There the court was called upon to interpret a 1945 statute exempting from taxation under certain circumstances "[p]roperty used exclusively for ... hospital ... purposes ...." (Rev. & Tax. Code, § 214.) One of the challenged exemptions involved a piece of hospital property on which a tennis court had been built. The tennis court was maintained for use as a recreational facility by student nurses, interns and residents employed at the hospital. The exemption was held to apply. The court stated that "under the rule of strict but reasonable construction, the phrase 'property used exclusively for...hospital... purposes' should be held to include any property which is used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of hospital purposes; or, in other words, for any facility which is reasonably necessary for the fulfillment of a generally recognized function of a complete modern hospital." (*Cedars of Lebanon Hosp.* v. *County of L.A., supra*, 35 Cal.2d 729, 736.) The tennis court itself was not used directly in the operation of the hospital. Nevertheless, the exemption applied because the court was used exclusively for the purpose of refreshing and reviving the doctors and nurses who, in turn, directly ministered to the needs of the hospital patients; the connection was close enough. Similarly here, the storage tank holds the fuel that powers the vehicles that are used directly in the raising of the chickens at Egg City. The connection is close enough.

APCD further contends that the exemption should not apply because the tank is a mere convenience; Egg City's vehicles could get their fuel elsewhere. We disagree. As the court in *Cedars of Lebanon Hospital* stated with regard to the tennis court, "[p]erhaps it may not be said that such recreational facility...is indispensable to the accomplishment of hospital purposes; but absolute indispensability does not commend itself as an appropriate test...." (35 Cal.2d at p. 745.) The fuel storage tank is actually, albeit indirectly, used in the agricultural operations in the raising of fowl at Egg City, and it is therefore entitled to the exemption provided in section 42310, subdivision (e).

The judgment is reversed insofar as it relates to the manure dryer. In all other respects, the judgment is affirmed.

Stephens, J., and Hastings, J., concurred.

A petition for a rehearing was denied March 27, 1981, and respondent's petition for a hearing by the Supreme Court was denied May 13, 1981.