[No. A021060. First Dist., Div. One. July 21, 1987.]

COUNTY OF ALAMEDA, Plaintiff and Respondent, v.
CITY OF OAKLAND, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rule 976.1, the portion of the opinion certified for publication follows.

**COUNSEL**

Richard E. Winnie and Jayne W. Williams, City Attorneys, Theodore R. Lakey and Joyce M. Hicks, Assistant City Attorneys, Ezra Rapport, Mark B. Shragge and Terry G. Brown for Defendant and Appellant.

Richard J. Moore, County Counsel, and Kelvin H. Booty, Jr., Assistant County Counsel, for Plaintiff and Respondent.

**OPINION**

NEWSOM, J.—The County of Alameda (hereafter respondent or the County) filed an action for breach of contract and declaratory relief against the City of Oakland (hereafter appellant or the City) on January 23, 1981. The County sought the proceeds from collection of bail paid for parking citations allegedly withheld by the City in breach of a written agreement (hereafter the Agreement) between the parties executed on November 16, 1971. The City asserted that the Agreement had been terminated and new obligations respecting processing and administering of parking citations created by subsequent conduct of the parties and statutory law.

After a trial upon exhibits and depositions filed with the court, judgment was entered in favor of the County for money wrongfully withheld, plus interest. The court also affirmed the continuing validity of the Agreement, and ordered the City to make monthly payments to the County in accordance with its terms. This appeal followed. The pertinent facts are as follows.

The Agreement provided that the task of issuing and processing parking citations would be undertaken by the City. The County would provide the judicial forum for resolution of disputes involving parking citations. Under the Agreement the City was to issue parking citations through its police force, collect bail posted on the citations, send notices of citations to offenders, prepare complaints and arrest warrants for unpaid citations, maintain adequate records both internally and with the Department of Motor Vehicles, and transmit money collected for parking citations to the

county treasurer. City clerical employees responsible for processing parking citations were given positions with the court as deputy clerks (Gov. Code, § 71270).

All money collected for the citations was paid to the county treasurer according to the Agreement. At that time, Penal Code section 1463[1] provided for division of parking citation payment as follows: 78 percent to the City and 22 percent to the County.[2] In addition, the Agreement provided that the City was to receive 22 cents for each citation for which bail was collected.

The Agreement was for repeating terms of one calendar year, but could be terminated by either party upon "written notice of such termination at least six (6) months prior to the commencement of a new contract year."

Because of increased processing costs, on May 16, 1977, Terry Adelman, acting for the City, wrote a letter to the County stating: "This letter is to serve as formal notification that the City intends to terminate the existing agreement between the County of Alameda and the City of Oakland, with respect to processing/administering parking citations . . . and to develop a new agreement to become effective January 1, 1978 . . . ." Adelman's letter acknowledged "that it is to the mutual advantage of both the City and County for the City to continue to provide complete parking citation processing," but noted that "monetary reimbursement" to the City was an issue to be addressed in the new contract.

Negotiations for a new contract ensued, with disagreement over a number of issues, most prominently compensation. But it was agreed that renegotiation of the existing Agreement was in the best interests of both the City and County: the City profited considerably from its share of income from parking citations in spite of escalating processing costs; and the County was not prepared to assume the role of administering the parking citation system. Thus negotiators for both sides, while recognizing that the City had terminated the Agreement, endeavored to fashion a new contract to be effective January 1, 1978. In fact, many provisions were agreed upon by October of 1977, although the amount of compensation to be paid to the City remained a major obstacle to a final new contract.

When it became apparent in November of 1977 that consensus on all terms would not be reached before the new year, the County Board of Supervisors was asked to approve a new contract "in principle," so that any agreement subsequently executed would be effective retroactively to Janu-

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Section 1463 also stated that the enumerated statutory division was subject to change by the parties, but the City and County did not do so in the Agreement.

ary 1, 1978. The board of supervisors so acted by resolution dated December 6, 1977. On that same date, the county administrator sent to the City for approval a proposed parking agreement, which provided that 1) the City would receive, in addition to its statutory share of parking fines collected, $227,112 per year from the County, an increase from the present rate, and 2) the County could terminate the contract if its yearly income from parking fines under section 1463 fell below $40,000. This proposal was subject to approval by the County Board of Supervisors and the City.

The proposed agreement was approved for form and legality by the city attorney, but was lost before formal approval by the City. On April 18, 1978, the City transmitted new copies of it to the County. By that time, however, the Jarvis-Gann initiative (Prop. 13) had qualified for the June ballot. In response, the County sent a letter to the City stating that "the Board of Supervisors has placed a freeze on the contractual commitment of County funds pending the outcome of the Jarvin/Gann . . . Proposition." The County returned the unexecuted copies of the proposed agreement to the City on June 8, 1978, with the comment that "fiscal uncertainties brought about by the passage of Proposition 13 prevent the County from entering into any increased contractual obligations."

Meanwhile, the City continued to process parking citations, collect fines and accept payment from the County in accordance with the terms of the original agreement. And negotiations between the parties for a new contract continued. The City resubmitted the unexecuted contract to the County, but the County again refused to approve it, noting that the recent substantial increases in parking fines would result in more revenue for the City under the terms of the original agreement.

On December 12, 1978, the City demanded an additional $227,112 from the County as the amount due under the "new agreement (effective January 1, 1978.)" In response, the County stated that it "does not intend to enter into the contract for *parking violation* services forwarded by you on December 12, 1978." Cited as reasons for rejection of the proposal were the bail schedule adjustments "resulting in increased revenues," and "the Proposition 13 impact on the County's finances . . . ."

In October of 1979, negotiations were resurrected, and ultimately six proposals were considered, one of them being the "existing agreement," pursuant to which the "service charge of 22 cents per citation would be maintained at an approximate annual amount of $65,000 to $70,000 per year." In February of 1980, the County Board of Supervisors approved a resolution in principle, increasing compensation to the City from 22 cents to 36.79 cents per citation. A draft of this proposal was submitted by the city

manager to the city attorney for review; the accompaning interoffice letter stated: "The City still provides parking administration services and the County continues to reimburse the City at the rate specified in the original (1971) agreement."

Instead of approving the proposal, the City, seizing upon certain recent Court of Appeal opinions,[3] announced that it would keep all fines collected from parking violations. The decisional authority upon which the City had relied to claim all proceeds from parking citations was essentially overruled in *County of Los Angeles* v. *City of Alhambra* (1980) 27 Cal.3d 184 [165 Cal.Rptr. 440, 612 P.2d 24], but an amendment to section 1463, effective September 25, 1980, prompted the City to reiterate its intention to "retain all monies received from parking violations that do not involve County personnel."[4]

To the County's proposal to raise the City's compensation for parking to 39.67 cents per citation, the City accordingly responded on December 22, 1980: "Under the recently passed bill all fines or bails collected by the City will be retained entirely by the City . . . ." The County insisted that an existing contract, rather than the amended version of section 1463, continued to govern the distribution of proceeds from the collection of parking fines. The City did not agree, and from December of 1980 withheld from the County all forfeited bail collected for parking violations. This action ensued.

The trial court found that the City's notice of termination of the Agreement dated May 16, 1977, "did not effect the termination of the contract, because it was waived by the City." The purported termination letter sent by the City on December 22, 1980, was also found ineffective as not in compliance with the terms of the Agreement. Finally, the court determined that section 1463, subdivision (3) "is inapplicable in the present case." The Agreement was thus found to still govern the relationshp of the parties.

The City's argument may be summarized as follows: that the Agreement was terminated in May 1977; that thereafter an implied contract between

---

[3] *City of San Diego* v. *Municipal Court* (1980) 102 Cal.App.3d 775 [162 Cal.Rptr. 420], and *Board of Trustees* v. *Municipal Court* (1979) 95 Cal.App.3d 322 [157 Cal.Rptr. 133].

[4] The amendment at issue is contained in paragraph 1 of subdivision (3) of section 1463, and reads: "Notwithstanding any other provision of law, in the event that a county or court elects to discontinue processing the posting of bail for an issuing agency, the city, district or other issuing agency may elect to receive, deposit, accept forfeitures and otherwise process the posting of bail for parking violations for which such city, district, or other issuing agency has issued a written notice of parking violation pursuant to Section 41103 of the Vehicle Code. Notwithstanding paragraph (1), if the city, district, or other issuing agency processes such posting of bail, the issuing agency may retain the forfeited bail collected."

the parties arose which called for increased compensation to the City and was terminable at will; that the implied contract was terminated by the City on December of 1980; and that by operation of section 1463, subdivision (3), the City is now entitled to all proceeds from bail collected for parking citations issued by city employees.

. . . . . . . . . . . . . . . . . . . . .*

■ Having found no merit in the first three of appellant's arguments, we turn to its final contention, that the enactment of section 1463, subdivision (3) superseded the Agreement and entitled it to retain all bail collected from parking citations. In support of its statutory claim to the funds, the City relies upon language in the second sentence of section 1463, subdivision (3), which provides: "[I]f the city . . . or other issuing agency processes such posting of bail, the issuing agency may retain the forfeited bail collected."

The County submits that the City has not been given unfettered authority to collect and retain forfeited bail by section 1463, subdivision (3), directing our attention to the first sentence of the subdivision, which, in pertinent part, reads: "[I]n the event that a county or court *elects* to *discontinue processing* the posting of bail for an issuing agency, the city . . . or other issuing agency may elect to receive, deposit, accept forfeitures and otherwise process the posting of bail for parking violations . . . ." (Italics added.) The County insists that "the triggering event is the election by a county or a court to discontinue the processing." Unless a county *discontinues* processing the posting of bail, a city may not undertake that function and retain all forfeited bail. According to the County, the triggering event did not occur here: by the Agreement the County authorized the City to process parking citations and collect bail, so that instead of refusing to process the posting of bail, the County merely turned that function over to the City or its agent. ■ Our first task is therefore to determine whether section 1463, subdivision (3) entitles a city to unconditionally retain all forfeited bail.

■ Because the statutory language is ambiguous, we must endeavor to discern the legislative intent in order to effectuate the law's purpose. (*People v. Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr 144, 514 P.2d 1224].) As required by established authority, we

---

* See footnote, *ante,* page 858

look first to the words used, keeping in mind the nature and purpose of the enactment, and construing the statutory language in a manner promotive of the intent of the law. (*People* v. *Overstreet, supra,* 42 Cal.3d at p. 895; *Pennisi* v. *Department of Fish & Game* (1979) 97 Cal.App.3d 268, 272 [158 Cal.Rptr. 683].) " ' "The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction." ' " (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 170 [154 Cal.Rptr. 263].)

 Section 1463, subdivision (3) was enacted in the context of a dispute over the division and distribution of the proceeds from parking citations between cities, which provide arresting officers, and counties, which provide the judicial forum for those who wish to contest such citations. Subdivision (1) of section 1463 specifies that "fines and forfeitures . . . collected upon conviction or upon the forfeiture of bail, together with moneys deposited as bail, in any municipal court or justice court" shall be deposited with the county treasurer. Subdivision (1)(c) sets forth the monthly schedule of percentage distribution from the county treasurer for arrests made by city officers—78 percent for the City and 22 percent for the County. By mutual agreement a county and city may adjust the statutory percentages. (§ 1463, subd. (1)(c).) Two appellate decisions have held that bail paid directly to the city—that is, fines not collected upon conviction or upon forfeiture of true bail by failure to appear—need neither be deposited with the county treasurer nor distributed to the county under section 1463, subdivision (1), and that the county had no duty to accept such money or become otherwise involved in the processing function. (*City of San Diego* v. *Municipal Court, supra,* 102 Cal.App.3d 775, 779; *Board of Trustees* v. *Municipal Court, supra,* 95 Cal.App.3d 322, 327.)[5]

Subsequently, in *County of Los Angeles* v. *City of Alhambra, supra,* 27 Cal.3d 184, our high court indicated its disapproval of these decisions, adding: "We recognize that the probable reason the Legislature required distribution to counties of a share of fines and forfeitures emanating from city arrests (Pen. Code, § 1463, subd. (1)(c), (d)) was to reimburse the counties for the added caseload in their municipal and justice courts." (*Id.* at p. 194.) The court also observed that "on authority of *Board of Trustees* v. *Municipal Court, supra,* 95 Cal.App.3d 322," the Alhambra Municipal Court had indicated it "would discontinue accepting parking citations as to which a complaint had not yet been filed." (*Ibid.*) Additional legislation was

---

[5] It is upon these decisions and section 1463, subdivision (3) that the City relied in claiming, in its letter of December 22, 1980, entitlement to "all monies received from parking violations that do not involve County personnel."

suggested to meet the need for "fiscal adjustment to reflect that change of function." (*Ibid*.)

The bill amending section 1463, subdivision (3) was prompted by the response to these decisions in some municipal courts, which simply declined to process parking citations. Thus, initial versions of the bill were phrased to permit cities, at their election, to process parking citations and retain forfeited bail. After complaints by the County Supervisors Association that cities were being given unfettered discretion to process citations, collect fines and retain forfeited bail, the final version of the bill amending section 1463, subdivision (3) added the caveat, "in the event that a county or court elects to discontinue processing the posting of bail for an issuing agency," the City may elect to perform that function.

 "[T]he Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them." ' " (*People* v. *Overstreet, supra,* 42 Cal.3d 891, 897; quoting from *Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874].) The history of the bill which became the current version of section 1463, subdivision (3) reveals that it was contemplated as an adjustment of revenue sharing in the event a county discontinued processing parking citations for which a complaint had not been filed. There is no indication that the Legislature sought to alter the existing statutory percentage distribution stated in subdivision (1)(c) of section 1463[6] where a county has not refused to process parking citations. Our conclusion has the effect of harmonizing subdivisions (1) and (3) of section 1463. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].)

Nor does it appear to us that the Legislature intended to change preexisting intergovernmental arrangements. We discern from the circumstances surrounding enactment of the bill that its essential objective was to permit a city to assume sole function of processing citations at full compensation upon abdication of that role by the county, thereby remedying a perceived impediment to enforcement of parking citations. We accordingly conclude that a city's right under subdivision (3) of section 1463 to retain all forfeited bail collected—contrary to the percentage distribution provisions of subdivision (1) of the same section—is conditioned upon an election by the county "to discontinue processing the posting of bail" for that city.

 We have next to construe the meaning of the phrase "discontinue processing the posting of bail," again giving paramount consideration

---

[6]This section was not repealed or amended in substance.

to the legislative intent. (*People* v. *Overstreet, supra,* 42 Cal.3d 891, 895.) Under the unique circumstances of this legislation, we cannot understand the term "discontinue" as including, as the City suggests, an existing contractual relationship whereby a county has enlisted the services of the issuing agency to process parking citations for a specified compensation in addition to the statutory percentage. The term "discontinued" must be given a narrower interpretation. Viewed in historical perspective, "discontinued" as here used can only be understood to refer to the limited situation in which a county *unilaterally* decides to withdraw from parking citation processing duties, leaving the issuing agency free to elect to process such citations and retain forfeited bail without depositing the moneys with the county treasurer in accordance with subdivision (1) of section 1463. We think such an interpretation of section 1463, subdivision (3) furthers the legislative intent and harmonizes the law with other related provisions.

The County did not discontinue processing parking citations within the meaning of section 1463, subdivision (3) as we construe it. Accordingly, the trial court did not err in finding that the City had wrongfully withheld forfeited bail collected from the County. The City must continue to deposit such moneys with the county treasurer and abide by the Agreement until valid and sufficient notice of termination is given to the County or a new contractual relationship is fashioned.

The judgment is affirmed.

Racanelli, P. J., and Elkington, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 21, 1987.