[No. A131449. First Dist., Div. One. Aug. 8, 2011.]

PROFESSIONAL ENGINEERS IN CALIFORNIA GOVERNMENT et al.,
Plaintiffs and Appellants, v.
DEPARTMENT OF TRANSPORTATION et al., Defendants and
Respondents.

COUNSEL

Somach Simmons & Dunn, Jennifer T. Buckman, Kanwarjit S. Dua and Gerald A. James for Plaintiffs and Appellants.

Ronald W. Beals, Thomas C. Fellenz, Todd Van Santen and Erin E. Holbrook for Defendant and Respondent California Department of Transportation.

Nossaman, Stephen N. Roberts and Stanley S. Taylor III for Defendant and Respondent San Francisco County Transportation Authority.

Stoel Rives, Barbara A. Brenner and Craig A. Carnes for American Council of Engineering Companies of California as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

**MARCHIANO, P. J.**—This case involves the validity of a public-private partnership for the construction of phase II of the Presidio Parkway Project in San Francisco. Plaintiffs, Professional Engineers in California Government et al., sought a writ of mandate and a permanent injunction to prohibit defendants, California's Department of Transportation et al. (CalTrans), from further implementation of a public-private partnership (P3) for phase II on the ground that phase II did not qualify as a P3 under Streets and Highways Code section 143 (section 143).[1] The trial court denied relief. Plaintiffs raise three challenges to phase II, all involving statutory interpretation of section 143. We disagree with plaintiffs' arguments for the reasons set forth below, and affirm.

## I. PROCEDURAL HISTORY & FACTS

The essential facts are undisputed. Because we agree with its analysis, we rely substantially on the trial court's written opinion, which is essentially a statement of decision.

---

[1] Section 143 will refer to section 143 of the Streets and Highways Code. We will cite subdivisions of section 143 without repeating the Streets and Highways Code designation.

The Presidio Parkway Project (Project) involves the replacement of the existing southern approach to the Golden Gate Bridge, known as Doyle Drive, with a new six-lane parkway. Doyle Drive is part of a state highway, State Route 101. The trial court found that the current Doyle Drive approach, which is 75 years old, "does not meet current highway standards and is seismically deficient."

The Project began in 1998 with a feasibility study conducted by the San Francisco County Transportation Authority (SFCTA) pursuant to a memorandum of understanding (MOU) with CalTrans, which provided funding along with "oversight, reviews and approvals."

SFCTA and CalTrans entered into a series of cooperative agreements in 2003, 2006, and 2009 regarding phase I of the Project. These agreements gave SFCTA a lead role in the Project, but also gave CalTrans "a substantial degree of oversight and control over the development of the project." While SFCTA was the lead agency for preliminary project development design and environmental studies, the resulting documents had to be submitted to CalTrans for its " 'review and concurrence' " and its " 'ongoing review.' " CalTrans retained the right to monitor and participate in the selection of personnel and was to provide " 'quality assurance.' " The trial court found that "[t]hese general terms in varying degrees of detail may be found in all of the various Cooperative Agreements by which SFCTA and CalTrans proceeded with the planning and implementation" of phase I of the Project.

Preliminary design, engineering and environmental documents that were necessary precursors to the beginning of construction were completed in 2008. Phase I of the Project includes part of the permanent facility and a detour to accommodate traffic during phase II. Phase I construction was underway at the time of trial below under the set of existing contracts.

In 2009, the Legislature amended section 143 to greatly expand the statutory authorization of P3's for state highway transportation projects. (Sen. Bill No. 2X 4 (2009–2010 2d Ex. Sess.) § 5 (Senate Bill 2X 4).) As the trial court found, the amendments deleted previous limitations on the number and type of transportation projects eligible to be P3's. The amendments expanded the purpose of P3's to include projects "primarily designed to achieve improved mobility, improved operations or safety, and quantifiable air quality benefits." (Stats. 2009, 2d Ex. Sess. 2009–2010, ch. 2X, § 4.)

Specifically, section 143, subdivision (c)(3) provides, in pertinent part: "The projects authorized pursuant to this section shall be primarily designed to achieve the following performance objectives: [¶] (A) Improve mobility by

improving travel times or reducing the number of vehicle hours of delay in the affected corridor. [¶] (B) Improve the operation or safety of the affected corridor. [¶] (C) Provide quantifiable air quality benefits for the region in which the project is located."

As the trial court also found, "The amendments authorized CalTrans to enter into an unlimited number of P3's without legislative approval provided that any proposed P3 be released for public comment at a hearing and thereafter be submitted to the Legislature and the newly established [Public Infrastructure Advisory Commission] for comment at least sixty . . . days before execution." (See § 143, subd. (c)(5).)

The 2009 amendments included new section 143, subdivision (f)(1)(A): "Notwithstanding any other provision of this chapter, for projects on the state highway system, [CalTrans] is the responsible agency for the performance of project development services, including performance specifications, preliminary engineering, prebid services, the preparation of project reports and environmental documents, and construction inspection services. [CalTrans] is also the responsible agency for the preparation of documents that may include, but need not be limited to, the size, type, and desired design character of the project, performance specifications covering the quality of materials, equipment, and workmanship, preliminary plans, and any other information deemed necessary to describe adequately the needs of [CalTrans] or regional transportation agency."

CalTrans began to implement phase II of the Project as a P3, contemplating that the construction of the remainder of the Project and the long-term maintenance of the facility would be the responsibility of the private contractor which entered into the P3 agreement with CalTrans and SFCTA. CalTrans and SFCTA entered into a new P3 cooperative agreement that provided responsibility to CalTrans for project development services under section 143, subdivision (f)(1)(A). The parties agreed that CalTrans would be the implementing agency for the Project with responsibility for developing and implementing technical specifications and procurement procedures, including directing and controlling the work of any consultants hired by SFCTA.

On May 20, 2010, the California Transportation Commission approved the Project as a P3 pursuant to section 143, subdivision (c)(2). On October 15, 2010, CalTrans announced it would award the P3 contract for the Project to Golden Link Partner G.P. On October 19, 2010, CalTrans released the final P3 agreement on its Web site. On October 21, 2010, there was a public hearing. On October 23, 2010, the P3 agreement was submitted to the Legislature and to Public Infrastructure Advisory Commission for review and comment, pursuant to section 143, subdivision (c)(5). The commission and certain legislators provided comments to CalTrans.

The P3 agreement would make the private contractor the lessee of the Project for the term of the agreement.

On November 2, 2010, plaintiffs filed a complaint challenging further implementation of phase II of the Project as a P3, on the ground that the Project violates section 143. Plaintiffs filed a combined petition for writ of mandate and complaint for declaratory and injunctive relief. After a hearing, the trial court denied plaintiffs relief in a detailed written order. The court then entered a judgment dismissing the complaint for declaratory and injunctive relief and denying the petition for writ of mandate.

We have expedited plaintiffs' appeal because, as the trial court noted, any delay in the implementation of phase II delays the entire Project. Furthermore, CalTrans has negotiated rights of entry onto the federal land surrounding the Project and those rights expire in 2015. The P3 agreement has a number of deadlines to keep the Project on track for completion before the entry rights expire.

## II. DISCUSSION

Plaintiffs raise three challenges to the Project, claiming it does not qualify as a P3. All of the challenges involve questions of statutory interpretation.

■ "The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.]" (*O'Kane v. Irvine* (1996) 47 Cal.App.4th 207, 211 [54 Cal.Rptr.2d 549].) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.]" (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) Where the statutory wording is clear a court "should not add to or alter [it] to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*O'Kane v. Irvine, supra*, 47 Cal.App.4th at p. 211.) Furthermore, statutory language must be viewed in context, " 'keeping in mind the nature and obvious purpose of the statute where they appear.' " (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224] (*Moyer*), quoting *Johnstone v. Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].) "We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' . . . We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129], citations omitted.)

Using these principles of statutory construction, we review de novo a question of statutory interpretation. (*Argaman v. Ratan* (1999) 73 Cal.App.4th 1173, 1176 [86 Cal.Rptr.2d 917].)

■ 1. First, plaintiffs contend that CalTrans has not been the "responsible agency" for the Project within the meaning of section 143, subdivision (f)(1)(A). Plaintiffs focus on the preliminary work done before the 2009 amendments to section 143 that greatly expanded the scope of P3 projects in this state, and argue CalTrans did not actually perform the engineering work—consultants retained by SFCTA did. But this does not invalidate the Project for the following reasons.

■ To begin with, it is unreasonable to invalidate an earlier phase of a lengthy, ongoing project because of a change in the law meant to enhance and encourage such projects. We cannot go back in time and invalidate work done on an essential public project before a change in the law made that project one of a different type. In our view, the Legislature would not have enacted Senate Bill 2X 4 with the thought in mind that existing projects, on which precious state funds had been expended, would not qualify for the very P3 status contemplated by the new law. Senate Bill 2X 4 looked back to the future to provide a legally creative way to build phase II, a necessary component to the success of the project. ■ We cannot construe a statute in a way that makes its provisions nugatory or ineffective, especially when that would frustrate the clear legislative purpose. (See *People v. Carter* (1996) 48 Cal.App.4th 1536, 1540 [56 Cal.Rptr.2d 309].)

■ Secondly, plaintiffs' arguments boil down to a simple semantic error: CalTrans is only required to be *responsible for the performance* of the work on the Project. CalTrans is not required to *actually perform* the work. This is a commonsense reading of the statute. To be a responsible agency connotes supervisory control—not necessarily actual performance of the supervised work.

Counsel for plaintiffs cited legislative history in support of their claim that the 2009 amendments to section 143 made a significant change to the statute and supported their position that CalTrans must actually perform engineering work on P3 projects. In particular, counsel referred us to paragraphs 14 and 22 of the bill analysis for Senate Bill 2X 4. But these paragraphs only provide that CalTrans be "responsible" and the "responsible agency" for preliminary project development work, and "may" use its employees or consultants. Nothing in this language changes our interpretation of the statutory language in its context. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 2X 4 (2009–2010 2d Ex. Sess.) as amended Feb. 14, 2009, ¶¶ 14, 22.)

■ Plaintiffs' reliance on section 143, subdivision (f)(1)(B) is misplaced. Section 143, subdivision (f)(1)(B) states: "The department may use department employees or consultants to perform the services described in subparagraph (A), consistent with Article XXII of the California Constitution. Department resources, including personnel requirements, necessary for the performance of those services shall be included in the department's capital outlay support program for workload purposes in the annual Budget Act." This section merely states that any CalTrans resources, including personnel requirements such as employees and consultants, necessary for the performance of the services described in section 143, subdivision (f)(1)(A) "shall be included in [CalTrans's] capital outlay support program for workload purposes in the annual Budget Act." (§ 143, subd. (f)(1)(B).) Section 143, subdivision (f)(1)(B) only means that *if* CalTrans resources are used to perform any of the services described in section 143, subdivision (f)(1)(A), the resources must be included in a certain portion of the budget. The section does not *mandate* that CalTrans personnel actually perform all of the services—only that it be the responsible agency whether or not it performs any of the actual work.

■ Our conclusion is consistent with the broad powers granted CalTrans by the Legislature. Section 143, subdivision (f)(2) states that CalTrans (as well as regional transportation agencies), "may exercise *any power* possessed by it with respect to transportation projects to facilitate the transportation projects pursuant to this section." (Italics added.) Streets and Highways Code section 92 authorizes CalTrans to do "any act necessary, convenient or proper for the construction, improvement, maintenance or use of all highways which are under its jurisdiction, possession or control." Streets and Highways Code section 114 authorizes CalTrans to enter into cooperative agreements with local agencies, provided that CalTrans remains the responsible agency under section 115 of the Streets and Highways Code.

■ We also note that section 143, subdivision (s), specifically identifies the Project as a P3 project. We must avoid construing a statute to render any part of it superfluous. (*Moyer, supra*, 10 Cal.3d at p. 232.)

■ We thus conclude section 143, subdivision (f)(1)(A) does not require CalTrans to perform the actual engineering work on a P3 project, but only to be the responsible agency.[2]

---

[2] Plaintiffs make two miscellaneous arguments that do not require extensive discussion. First, plaintiffs contend that several statutes, particularly Public Contract Code section 6808, support their contention that only CalTrans employees and consultants can perform work on P3 projects. Public Contract Code section 6808 was enacted as part of the same legislation that amended Streets and Highways Code section 143 in 2009. Like section 143, Public Contract Code section 6808 was intended to encourage construction projects involving partnerships with private entities, i.e.,

2. Plaintiffs next contend the Project does not qualify as a P3 project because it is not "supplemental" to an existing facility, but is rather a rehabilitation or reconstruction of an existing facility. Their argument is based on section 143, subdivision (a)(6), which provides: " 'Transportation project' means one or more of the following: planning, design, development, finance, construction, reconstruction, rehabilitation, improvement, acquisition, lease, operation, or maintenance of highway, public street, rail, or related facilities *supplemental to existing facilities currently owned and operated by [CalTrans] or regional transportation agencies . . . .*" (Italics added.)

The trial court noted that a standard dictionary definition of "supplement" is " 'to complete, add to, or extend by a supplement.' " Another standard definition is "[t]hat which supplies a want or makes an addition . . . something which completes or adds a finishing touch." (Webster's New Internat. Dict. (2d ed. 1950) p. 2534, col. 2.)

Under any standard definition, the record reveals that the Project is clearly supplemental to existing facilities and adds capacity.[3] For example, the southbound exit ramp from Doyle Drive to Veterans Boulevard will be widened to two lanes. The Project adds two viaducts and several other elements that did not previously exist, including a new six-lane parkway with upgraded seismic safety features; improved highway safety features; a new wide median; and new direct access to the Presidio and Marina Boulevard. These improvements do not simply involve a reconstruction of an existing project, but rather a series of supplemental new improvements to existing facilities—a portion of a state highway—currently owned and operated by CalTrans. Additionally, by the time phase II begins, phase I will be completed and constitute an existing facility—and the new facilities in phase II will necessarily supplement phase I.

3. Finally, plaintiffs contend the Project does not qualify as a P3 project because it does not require funding through the use of tolls or user fees. Plaintiffs rely on section 143, subdivision (j)(1), which provides, in pertinent part: "Agreements entered into pursuant to this section shall authorize the contracting entity or lessee to impose tolls and user fees for use of a facility

---

"design build" projects. (Pub. Contract Code, §§ 6800, 6801, subd. (d), 6803, 6804.) Public Contract Code section 6808 has the same language as section 143, subdivision (f)(1)(A), making CalTrans the responsible agency for such projects.

Plaintiffs also argue the Professional Engineers Act (Bus. & Prof. Code, § 6700 et seq.) supports their position. We agree with defendants that this Act is not pertinent here. It merely requires licensed engineers in California be in "responsible charge" of engineering work, to protect the public. (Bus. & Prof. Code, §§ 6703, 6704.) "Responsible charge" does not equate with "responsible agency," as used in section 143, subdivision (f)(1)(A).

[3] We disagree with defendants' contention that the word "supplemental" modifies only the phrase "related facilities" and not all of the types of projects listed in the statute.

constructed by it, and shall require that over the term of the lease the toll revenues and user fees be applied to payment of the capital outlay costs for the project, the costs associated with operations, toll and user fee collection, administration of the facility, reimbursement to [CalTrans] or other governmental entity for the costs of services to develop and maintain the project, police services, and a reasonable return on investment. . . ."

Plaintiffs point to the phrase "shall authorize" and note that "shall" is typically construed as mandatory (see, e.g., *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]). They argue the clause providing P3 agreements "shall require" that any toll revenues be used to defray certain costs, plus other references to tolls and fees in the statute (see, e.g., section 143, subds. (d), (i) & (j)(2)) demonstrates the Legislature intended all P3 projects to be funded by tolls and user fees.

 We agree with the trial court's conclusion that P3 agreements must *authorize* tolls and user fees, but not necessarily *require* them for every project: "[Section 143] fall[s] short of *requiring* the use of tolls and user fees as a *necessary* funding element or the *sole* funding source in every P3. If that were the legislative intent, it would have been easy to state it [fn. omitted]." (Original italics.)

Also, again as the trial court pointed out, "transportation projects" are broadly defined in section 143, subdivision (a)(6) to include activities such as planning and design, for which, of course, tolls and fees could not be charged. It is unreasonable to infer a legislative intent to require tolls that cannot be collected.

Finally, section 143, subdivision (s) specifically provides no P3 agreement can be entered into that "affects, alters, or supersedes the Memorandum of Understanding (MOU), dated November 26, 2008, entered into by the Golden Gate Bridge Highway and Transportation District, the Metropolitan Transportation Commission, and the San Francisco County Transportation Authority, relating to the financing of the U.S. Highway 101/Doyle Drive reconstruction project located in the City and County of San Francisco."

As plaintiffs concede, the MOU specifically allows for tolls only when certain limited conditions are met.[4] As the trial court correctly found, an

---

[4] Section 2 of the MOU provides that, with the exception of a one-time contribution from two agencies which is not pertinent here, "there will be no tolling of any kind on the Golden Gate Bridge or on Doyle Drive to fund the Doyle Drive Reconstruction Project, except as provided in Section 3 . . . ."

Section 3 provides: "Regional Cordon Tolling Program. A regional cordon tolling program for the purposes of congestion management that tolls the Doyle Drive entrance to San

interpretation for mandatory tolling would therefore violate the MOU incorporated in section 143, subdivision (s).

## III. DISPOSITION

The judgment dismissing the complaint for declaratory and injunctive relief and denying the petition for writ of mandate is affirmed.

Margulies, J., and Dondero, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 16, 2011, S196531.

---

Francisco in a similar manner and time frame as all other entrances to San Francisco are tolled may be permitted. Funds collected pursuant to a regional cordon tolling program may be expended on the Doyle Drive Reconstruction Project."