Filed 5/3/23

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| GUADALUPE MENDOZA,<br><br> Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br> Respondent;<br><br>THE PEOPLE,<br><br> Real Party in Interest. | F084354<br><br>(Super. Ct. No. BF170463A)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; Application for writ of mandate or prohibition. Chad A. Louie, Judge.

The Law Office of A. Roxane Bukowski and A. Roxane Bukowski for Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Lance E Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Christopher J. Rench, Deputy Attorneys General, for Real Party in Interest.

-ooOoo-

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the subpart of the Factual and Procedural Background titled "Preliminary Hearing Evidence."

# INTRODUCTION

Guadalupe Mendoza sought an alternative writ of mandate/prohibition after the superior court denied his Penal Code section 995 motion to dismiss a charge for active participation in a criminal street gang (§ 186.22, subd. (a)) and gang enhancements (§ 186.22, subd. (b)(1)) attached to multiple counts. (Undesignated statutory references are to the Penal Code.) In the motion, Mendoza argued the gang offense and enhancements should be dismissed in light of the changes to section 186.22 effectuated by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which became effective January 1, 2022. He asserted the gang offense and enhancements were proven at the preliminary hearing under the former law, but the evidence presented at the preliminary hearing was insufficient under the new definitions of "pattern of criminal gang activity" and "criminal street gang" to support the charges. The court denied the section 995 motion and, initially, we denied Mendoza's writ petition from the court's order. Mendoza then petitioned the California Supreme Court for review, and the matter was transferred back to us.

In its transfer order, the California Supreme Court directed us to vacate our order denying the petition for writ of mandamus and to issue an order directing the respondent superior court to show cause why the relief sought in the petition should not be granted. Our court issued an order to show cause and the People filed a response conceding Assembly Bill 333 should apply retroactively to the gang enhancements and substantive charge alleged in this case. They argue the matter should be remanded and they should be permitted the opportunity to conduct further preliminary hearing proceedings on the substantive gang offense and gang-related enhancements. In his reply, Mendoza contends Assembly Bill 333 requires us to dismiss the gang offense and enhancements. However, he asserts the People may refile the information below.

We agree with the parties that Assembly Bill 333 applies retroactively to the preliminary hearing proceedings. We reject Mendoza's contention dismissal of all gang

2.

related charges is required. For the reasons set forth in this opinion, we will issue a writ of mandate directing the respondent court to vacate the magistrate judge's holding order as to the active gang participation offense and the gang enhancements, and to hold further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 28, 2017, Camilo G. was near the driveway of his friend's house when he saw a car stop in the roadway. Camilo G. saw people exit the car and then multiple gunshots were fired in his direction; one shot hit Camilo G. in the leg. After the incident, police pursued a car that resembled the suspect vehicle, and the vehicle's occupants—Mendoza, Ruben Mendoza and Jaime Ramos—were apprehended and charged in connection with Camilo G.'s shooting.

On November 30, 2017, a felony complaint was filed against Mendoza in connection with the shooting. The court held a preliminary hearing at which evidence was presented against Mendoza and his two codefendants—Ruben Mendoza and Jaime Ramos—on multiple charges and enhancements. The preliminary hearing occurred over the course of two days (June 25th and 26th of 2019). The transcript of the hearing spans over 200 pages.[1] During the hearing, the prosecution presented 11 witnesses and 24 exhibits. There was extensive testimony presented related to the circumstances of the charged offense, subsequent searches conducted pursuant to search warrants, DNA evidence, and gang evidence, including evidence related to the Varrio Rexland Park criminal street gang, predicate offenses, and the three defendants' alleged gang affiliations and prior police contacts.[2]

---

[1]Because the parties agree the evidence presented at the preliminary hearing was insufficient under the amended law to hold Mendoza to answer to the active gang participation charge and the gang enhancements, we do not discuss the specifics of the evidence presented at the preliminary hearing in the published portion of our opinion as they are not necessary to our analysis or ultimate conclusions.

[2]The predicate offense evidence consisted of a March 28, 2015, shooting involving Miguel Perez for which Perez was convicted of discharging a firearm or BB gun in a grossly negligent manner (§ 246.3), a violation of section 29800, and a 2013 case involving Carlos

At the conclusion of the preliminary hearing, the court found probable cause to believe the defendants had committed the offenses and enhancements charged. It held each defendant to answer to six different charges and multiple enhancements.

***Preliminary Hearing Evidence***[*]

At 6:39 p.m. on November 28, 2017, Deputy Sheriff Christopher Gonzalez responded to Vern Street in Bakersfield where he found Camilo G. bleeding profusely from a gunshot wound in his right leg. There were bullet holes in the driver's side of the car in front of the driveway where Camilo G. was lying, in the garage door, and the residence. The police recovered 10 to 15 LC17 .223 shell casings from the scene.

At about 6:36 p.m. that evening, Officer Ian Jones and two other officers were in a parking lot approximately a quarter mile away from the shooting when they heard about 15 shots fired in the neighborhood south of them. Between 20 and 30 seconds after the shots, Officer Jones saw a black Mercedes-Benz pass by; there were three individuals inside. The passengers were slumped down and appeared to be trying to conceal themselves. Officer Jones pursued the car and attempted to stop it to find out if it was involved in the shooting because it was in such close proximity. He put on his police lights and siren to signal to the car to yield, but the car failed to stop. Officer Jones continued to pursue the car and noted the car "made an unsafe movement passing several vehicles" at the beginning of the pursuit; it was speeding and straddling lanes, went through a red light, went off the road onto the dirt shoulder to pass cars, and ran through stop signs in the Rexland Acres neighborhood.

The Mercedes-Benz eventually stopped at a dead end and three subjects got out. Officer Jones identified Jaime Ramos as the driver, Mendoza as the front passenger, and

---

Gomez, Justin Valencia, and Miguel Perez in which they were each convicted of assault with force likely to produce great bodily injury or death. (§ 245, subd. (a)(4).)

[*]See footnote, ante, page 1.

4.

Ruben Mendoza as the passenger on the rear passenger side of the car. All three subjects immediately ran to a nearby canal where other officers apprehended them.

Deputy Sheriff Christopher Cooper responded to Rexland Drive that evening. D.V., a neighborhood resident, told Cooper she saw a four-door black car go by her house and three police cars following it. After the vehicles passed, she found a gun in her yard that she thought was a toy. She picked it up and carried it a few feet before she realized "it was possibly a real gun." She put it back on the ground, went in her house, and then called her parents who called 911. She directed Cooper to the gun, an AR-15-style assault rifle. It was broken into three pieces, loaded, and jammed. Cooper testified that throwing a gun from a moving vehicle could cause it to break in the manner the rifle was broken. LC17 .223-caliber rounds were found in the gun's magazine. Cooper recovered a .223-caliber shell casing from the back passenger floorboard of the black Mercedes-Benz.

Senior Deputy Christian Melero spoke with Camilo G. at the hospital after the shooting. Camilo G. told Melero he was going to his friend Andrew's house when he saw a black "box-style, older sedan" he thought was a BMW drive by. Deputy Melero showed him a photo of the suspect vehicle, the black Mercedes-Benz, and Camilo G. identified it as the car he saw. Camilo G. saw this car drive by in the same direction two times. The second time, Camilo G. was near Andrew's driveway when he saw the black car come to a "hard stop." He saw subjects exit the car and then he heard gunshots and felt a shot hit his leg. He approximated over five rounds were fired and reported the subjects were shooting at him. He was unsure how many people exited the car and could not identify any of them because it was dark; he did not hear them say anything. Camilo G. denied being a gang member or associating with a gang and did not say he believed the shooting was gang related. He stated he did not have a "beef" with anyone. He also stated he did not know defendants Mendoza, Ruben Mendoza, or Jaime Ramos.

5.

Deputy Melero later authored a search warrant for the suspect vehicle—a 1991 black Mercedes-Benz that was towed from the scene following the police pursuit. The police located several items inside the car, including Ramos's wallet with his identification card in the car's center console, Ruben Mendoza's wallet on the passenger side pocket with his identification inside, an LC17 .223 shell casing in the rear passenger floorboard, and a cellular phone. Melero took buccal swabs from the three defendants. He also took a buccal swab from D.V.

The shell casing recovered from the Mercedes-Benz and the rifle found in the yard were swabbed for DNA. The DNA profile taken from the rifle's trigger was found to be a mixture of at least two individuals; Jaime Ramos and D.V. were excluded as potential contributors, the results with regard to Mendoza were "unconclusive" [*sic*], and Ruben Mendoza "could not be excluded as a potential contributor," meaning many of his alleles were present within the DNA mixture found on the trigger.

Criminalist Jerry Garza explained the TrueAllele casework system helps deconvolute more challenging mixtures. He testified: "When a likelihood ratio is calculated using a TrueAllele casework system it was assumed that the evidence sample contained two contributors. A match between this evidence item and Ruben Mendoza is X times more likely to be than a coincidental match to a random unrelated person in the following reference populations. [¶] In the African-American population, 2.1 quintillion. In the Caucasian population, 3.5 quintillion. In the Hispanic population, 600 trillion."

As to the DNA swab taken from the "bottom of the stock of the tan rifle," it, too, was a mixture of at least two individuals; Jaime Ramos and D.V. were excluded as potential contributors, the results with regard to Mendoza were "inconclusive," and Ruben Mendoza "could not be excluded as a potential contributor." Ruben Mendoza was considered to be a "major contributor" to the DNA found on the trigger and the bottom of the rifle.

Regarding the DNA swab taken from the "lower [P]icatinny [rail] of the rifle," there was a mixture of at least two individuals. The results were inconclusive as to Jaime Ramos, D.V., and Mendoza; Ruben Mendoza "could not be excluded as a potential contributor." With regard to the lower Picatinny rail of the rifle, they used the "three-person mixture," "[s]o [Ruben Mendoza] was one of those parts," meaning about a one-third contributor.

Criminalist Apryl Brown compared the shell casings recovered in this case, and based upon her review, she opined they were all fired from the same gun.

Officer Brandon Geherty executed search warrants in connection with Camilo G.'s shooting, which included the home of Mendoza and Ruben Mendoza. In the southeast bedroom, he "located graffiti that read VRP X3," which he recognized to be "commonly associated with the Varrio Rexland Park street gang." The prosecution introduced photographs taken during the search. One photograph was taken of a cell phone in the residence that displayed Ruben Mendoza wearing a Pittsburgh Pirates hat, an item commonly associated with the Varrio Rexland Park (VRP) criminal street gang. There was also a photograph of another Pittsburgh Pirates hat found in the residence. A family member told Geherty she believed either Ruben Mendoza or Mendoza put the graffiti found on the dresser in the southeast bedroom. The family member said she knew Miguel Perez, Jose Cota, and Justin Valencia through Ruben Mendoza and Mendoza.

Geherty also executed a search warrant on Jaime Ramos's residence. The prosecution introduced a photograph of three hats located in Ramos's bedroom that were significant because they were commonly associated with the VRP criminal street gang: a Houston Rockets hat and two Pittsburgh Pirates hats. Geherty also saw a gun magazine and a blue bandana during the search. The blue bandana was significant because it "is commonly associated with surenos or southern Hispanic criminal street gangs" and the VRP gang is a southern Hispanic criminal street gang. A spent round of .223-caliber

ammunition, a rifle case, live 40-caliber handgun ammunition, a handgun holster, and a scope were also located in the residence.

Officer Geherty also testified as a gang expert. Based on his experience, he opined there is a gang known as the Varrio Rexland Park criminal street gang in Bakersfield. He had spoken to members of the VRP gang about crimes they commit and are involved in, and the gang's boundaries. He personally investigated several crimes involving the VRP gang and had testified as an expert on the gang.

Geherty gave several opinions regarding the VRP gang membership of several individuals. Miguel Perez is a VRP member based upon his tattoos and primary activities. Jose Cota, who had passed away, was also a VRP member based upon his tattoos and activities. Justin Valencia is also an active VRP gang member. Valencia self-admitted his VRP gang membership to Geherty, and stated he uses the moniker "Frost."

Geherty explained the traditional boundaries VRP claims. He testified Vern Street, where the shooting occurred, has another criminal street gang "commonly known as … Can't Stop Banging." And these "gang members often reside or hang out at, specifically [where the shooting occurred.]" Geherty explained, the Can't Stop Banging gang members have been contacted by Kern County Sheriff's Office or Bakersfield Police Department on Vern Street and either live or have lived on that street in the past.

Based on his contacts with active VRP gang members, Officer Geherty testified the VRP gang considers all other gangs to be its rivals, and Can't Stop Banging considers VRP to be a rival. VRP is its own neighborhood gang. But when their members are in custody, they align themselves with Sureños or southern Hispanic street gangs. VRP claims the color royal blue and members make the letters "R" and "P" with their hands and fingers as their identifying sign. Geherty opined VRP has more than three members in Bakersfield and it does not have any subsets. And it is common knowledge to active members or associates of the gang that VRP is engaged in a continuing pattern of criminal conduct. "Their primary activities range anywhere from burglary to sales of

narcotics to assaults with deadly weapons on peace officers to assault with deadly weapons in general, attempted homicides," illegal possession of firearms, and shooting at inhabited dwellings. According to Geherty, VRP was "active" on November 28, 2017.

He explained several ways to join the gang: an individual can be "born in, which means to have family already within the gang," "rushed in or jumped in, which is pretty much to be assaulted for a certain period of time," and when "that is over with you become part of the criminal street gang," or "to be crimed in or to put in work for the gang, which means to go out and commit assaults against" rivals or "commit burglaries, get money for the gang." Someone who is up and coming in the gang may commit a crime with other VRP gang members or on behalf of the gang; "[t]hat is one way to put in work." Multiple factors may be considered to determine if young gang members are working their way into the gang, including with whom they associate, the crimes they are committing, and their tattoos and apparel.

Geherty testified he was familiar with a June 6, 2013, case involving Carlos Gomez, Justin Valencia, and Miguel Perez from reading the offense reports and speaking to the deputies involved in the investigation. Gomez, Valencia, and Perez were convicted of assault with force likely to produce great bodily injury or death (§ 245, subd. (a)(4)), a primary activity of the VRP gang. Geherty was familiar with Gomez's tattoos and had listened to his jail calls in which Gomez mentioned "Lupe," "Ruben," and "Moco," which is Jaime Ramos's moniker. Geherty opined Gomez was an active member of the VRP street gang at the time of the 2013 offense.

Geherty also discussed a shooting that occurred on March 28, 2015, involving Miguel Perez. Perez was convicted of discharging a firearm or BB gun in a grossly negligent manner (§ 246.3) and a violation of section 29800 in connection with the incident. Geherty opined the other individuals Perez was with at the time—Yovani Leyva and Jose Contreras—were also active members of VRP.

Officer Geherty contacted Mendoza on July 6, 2017, within the traditional boundaries of the VRP gang. Geherty and another officer were on patrol and noticed Mendoza walking in the middle of the street. Mendoza was wearing a Kansas City Royals hat and "flying a blue bandana out of his rear pocket," which are common signs for the VRP gang. The officers learned Mendoza "was on probation and was attempting to conceal something in his waistband." Geherty located a loaded firearm in Mendoza's front waistband, which was significant because weapon possessions and violations are primary activities of the VRP gang. Geherty also testified Mendoza's residence was located in VRP gang territory.

Officer Robert Batchar participated in a battery investigation in Bakersfield on March 4, 2016. An individual named Jose V. reported Mendoza, Ruben Mendoza, and two other "unknown suspects" assaulted him. Jose V. was hit over the head with a beer bottle, fell to the ground, and was kicked several times. Jose V. reported that Mendoza and another unknown subject pointed handguns at him while he was on the ground. Jose V. believed they fought him because he looked at Mendoza "in a way which he didn't like." At the time, Jose V. stated he was dating Mendoza and Ruben Mendoza's sister. He identified Mendoza and Ruben Mendoza as members of the VRP gang.

As part of his investigation, Officer Batchar spoke to Mendoza after reading him his *Miranda* rights. According to Batchar, Mendoza reported he fought Jose V. because Jose V. was seeing Mendoza's sister and Jose V. "looked at him in a dirty way." Mendoza said Ruben Mendoza had nothing to do with the fight. While he was at Mendoza and Ruben Mendoza's address, Batchar spoke to their mother, Mrs. Mendoza. She reported her daughter was Jose V.'s ex-girlfriend; Jose V. was not welcome at her home; and he was constantly there looking for her daughter when he was intoxicated.

As to the incident with Jose V., Officer Geherty found it significant that Mendoza "felt disrespected." He noted Mendoza reported the subject was "'mean mugging him,'" meaning staring in a disrespectful manner. And "they combat[ted] that with a hyper

10.

violence. They do not want to seem weak. So they assault in a group fashion … by busting a beer bottle over his head and then displaying firearms towards him." He explained "hyper violence … commands respect which is a very big thing in the gang world." Geherty noted an assault with a beer bottle or a potentially deadly weapon is a primary activity of the VRP gang. He also found it significant that Mendoza, Ruben Mendoza, and the two other individuals were acting together during the incident, noting oftentimes "gang members will assault people in a group fashion to greater enhance their odds of successfully completing the assault."

Officer Geherty opined Mendoza and Ruben Mendoza were and are active members of the VRP gang and they were actively participating in the gang at the time of this offense (Nov. 28, 2017). In determining whether Jaime Ramos was a member of the VRP gang, Geherty considered that Ramos actively participated in the crime by acting as the driver of the suspect vehicle that led to the shooting and then he led law enforcement on a pursuit, "which further shows that he was attempting to evade and avoid capture by law enforcement." He also noted there were numerous signs of gang affiliation to the VRP gang at Ramos's residence, including a blue bandana, several hats and clothing commonly associated with the gang, as well as ammunition and a rifle case. Based on the totality of those circumstances, Geherty opined Ramos is and was an active member of the VRP gang and he was actively participating in the gang on November 28, 2017.

Officer Geherty opined the VRP gang was involved in the current shooting incident of Camilo G. He found it significant the shooting was committed on Vern Street, known rival gang territory, the police pursuit of the defendants ended in the "heart of Varrio Rexland Park territory," and that VRP gang graffiti, clothing, and apparel was located at each of the defendant's residences. Also significant was the use of firearms because "weapons violations" are among the VRP gang's primary activities.

The prosecutor posed Geherty with the following hypothetical scenario: "Three Varrio Rexland Park criminal street gang members conspire to commit a shooting at a

11.

juvenile on Vern Street in Bakersfield, California. One of them fires over ten rounds at the juvenile and at the occupied house where the juvenile is standing. He hits the juvenile once in the leg. [¶] Seconds after the shooting the three gang members drive away. They end up in a high speed pursuit with law enforcement and they throw an AR-15 out of the moving vehicle." Geherty opined "this hypothetical was for the benefit of the Varrio Rexland Park criminal street gang as well as in association with the Varrio Rexland Park criminal street gang."

Geherty testified the facts of the hypothetical offense benefit the gang in multiple ways. "[I]t benefits each member itself. It displays that each of these members is willing to conduct such a heinous act for the benefit of the criminal street gang which will then elevate their status within the gang. It will gain … respect for them within the gang and the more respect you have in the gang the more powerful you are, the more control you have."

The prosecutor then added these facts to the hypothetical offense: "If there's a shooting on Vern Street by Varrio Rexland Park at a young Hispanic male, whether or not that young Hispanic male is a known gang member, not a known gang member, whatever the case may be, does that still benefit the Varrio Rexland Park criminal street gang?" Geherty opined the shooting benefits the VRP gang "[b]y not only attempting to instill fear within the community outside of their territory but also instilling fear within rival gangs in that area. It also shows that the [VRP] gang has a fierce reputation and it bolsters that reputation by conducting that shooting" "regardless of who they are shooting at so long as it is in rival territory."

Geherty opined the hypothetical scenario was done in association with the gang in that there are three active VRP members conducting the crimes: one is acting as a shooter, one is acting as a lookout, and the third is acting as the driver who led law enforcement on a pursuit afterward. "So they are all three actively participating in this crime in association with one another. Thus forth [*sic*] acting in association with the

[VRP] gang." He explained, three VRP members committing a crime together elevates their status as individuals in the gang. Committing the crimes together allows the members to vouch for each other; it increases their rate of success for committing a crime; and it is a way to train younger gang members or bring them into the gang by making them do violent crimes. Geherty also opined the crimes in the hypothetical scenario promote and assist the VRP gang.

After the conclusion of the evidence, counsel for defendants argued the evidence presented was insufficient to show the shooting was gang-related and argued the gang enhancement should be dismissed. The prosecutor argued there was sufficient evidence of association and "the indicia in this case tells us that the primary motive, if not the only motive for the shooting in this case, is the gang rivalry because they are Rexland Park gang members and they are in rival territory."

### Charges and Information

Mendoza, Ruben Mendoza and Jaime Ramos were charged by information with the attempted murder of Camilo G. (Pen. Code, §§ 664, 187, subd. (a); count 1), shooting at an inhabited dwelling (*id.*, § 246; count 2), assault with an assault weapon (*id.*, § 245, subd. (a)(3); count 3), evading a police officer (Veh. Code, § 2800.2; count 4), active participation in Rexland Park, a criminal street gang (Pen. Code, § 186.22, subd. (a); count 5), and resisting, delaying, or obstructing a police officer (*id.*, § 148, subd. (a)(1); count 6). As to Mendoza, it was alleged the attempted murder (count 1) was done by a means listed in Penal Code section 189; counts 1, 2, 3, and 4 were committed for the benefit of, at the direction of, or in association with Rexland Park, a criminal street gang, with the specific intent to promote, further or assist in criminal conduct by gang members (*id.*, § 186.22, subd. (b)(1)); and, on counts 1 and 2, Mendoza was a principal in the offense and at least one principal intentionally and personally discharged and used a firearm and proximately caused great bodily injury to another person other than an accomplice (*id.*, § 12022.53, subds. (d), (e)(1)).

13.

***Section 995 Motion to Dismiss***

In April 2022, Mendoza filed a section 995 motion to dismiss the substantive gang charge (count 5) and the gang enhancements attached to counts 1, 2, 3, and 4 in light of the passage of Assembly Bill 333.  Mendoza argued the 2015 predicate offense presented involved only one alleged gang member "and therefore cannot establish a 'pattern of criminal gang activity' as required by the new legislation," and, he asserted, the 2013 predicate offense does not fall within the new requisite timeframe because it was not committed within three years of the current offense.  He also argued there was no evidence as to how either of the predicate offenses benefitted the gang and no evidence, other than reputational, was presented to prove the current offense benefitted the gang as required by the amended law.  He also asserted the prosecution failed to establish Varrio Rexland Park is an ongoing, *organized* association whose members engage in, or have engaged in, a pattern of criminal gang activity.  He further contended there was no evidence the predicate offenses presented constituted collective criminal activity.  He specifically argued the active gang participation count (count 5) must be dismissed because the prosecution failed to establish a pattern of criminal gang activity.

The People opposed the motion, arguing Assembly Bill 333 is unconstitutional because it made substantial amendments to section 186.22 and, thereby, amended Proposition 21; but it was not passed by a two-thirds vote of each house of the Legislature as required.

The court denied Mendoza's section 995 motion to dismiss.  It explained:

> "I'm going to be following the case law … in a different procedural scenario where a defendant is convicted after trial pending final judgment sentencing, the law changes on the elements required for the conviction. The Courts have sent it back and allowed the district attorney to go back and retry the case on the amended elements and the Court did not … indicate they were requiring the D.A. to go all the way back to a preliminary hearing.
>
> "So the defendant in those cases are in the exact same procedural posture as the defendants in this case.  Although, I do appreciate that the

14.

defendants in this case and in those other cases got to the same point in a different way. Given that they are in the same procedural posture in the other cases where … the Court does not require the D.A. to redo a preliminary hearing.

"Given that, I'm going to be denying the 995 motion. The case will move forward, but the People will obviously have to … try the case on the elements as they currently stand."

## DISCUSSION

Mendoza filed a section 999a petition for writ of mandamus seeking review of the court's order denying his section 995 motion to dismiss the active gang participation charge and gang enhancements. We now remand for further proceedings.

### I.     Assembly Bill 333 Applies Retroactively to the Preliminary Hearing Proceedings

Initially, the parties agree, as do we, that Assembly Bill 333's changes to section 186.22 should apply retroactively to the evidence presented at the preliminary hearing.[3]

#### A.     Applicable Law

##### 1.     *Assembly Bill 333*

After the preliminary hearing was held in this matter and Mendoza was held to answer on the charges, including the gang-related allegations, the Legislature enacted Assembly Bill 333, the STEP Forward Act of 2021, which, in part, amends section 186.22 to impose new substantive and procedural requirements for gang allegations. The legislation went into effect on January 1, 2022.

Assembly Bill 333 amended the definition of a "'criminal street gang,'" requiring proof that the gang is an ongoing, *organized* association or group of three or more persons, whose members *collectively* engage in, or have engaged in, a pattern of criminal

---

[3]In addition to the arguments submitted by Mendoza and the Attorney General, the Kern County District Attorney's Office previously filed an application for permission to file an amicus curiae brief in this case. In our original order denying the petition for writ of mandamus, which has now been vacated, we denied the application for permission to file an amicus curiae brief. For purposes of clarity, we reiterate the order denying the district attorney's application for permission to file an amicus curiae brief.

activity (§ 186.22, subd. (f)).  The law also created a stricter requirement for "'a pattern of criminal gang activity'" to prove the group with which the defendant is associated is indeed a criminal street gang.  (See § 186.22, subds. (e)–(f).)  Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another.  (See § 186.22, former subd. (e).)  Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses.  (§ 186.22, subd. (e)(2).)  In addition, the last of the predicate offenses must have "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed."  (§ 186.22, subd. (e)(1).)  The predicate offenses must have been committed "on separate occasions or by two or more members," and must have been for the "common[] benefit[] [of] a criminal street gang," and the common benefit of the offenses must be "more than reputational."  (*Ibid.*) Assembly Bill 333 also narrowed the list of offenses that may be used to establish a pattern of criminal gang activity (compare § 186.22, former subd. (e)(1)–(33) with § 186.22, current subd. (e)(1)(A)–(Z)).  Additionally, it now defines "to benefit, promote, further, or assist" throughout section 186.22 to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational."  (*Id.*, subd. (g).)  The legislation notes examples of a common benefit that are more than reputational "may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (*Ibid.*)

### 2.    *Retroactivity*

Section 3, which instructs that no part of the Penal Code applies retroactively, unless expressly so declared, has been interpreted to mean that new criminal laws do not govern prosecutions initiated before the law went into effect.  (See *People v. Padilla* (2022) 13 Cal.5th 152, 160; *In re Estrada* (1965) 63 Cal.2d 740, 746–748 (*Estrada*).)

However, the California Supreme Court has recognized an exception to this rule for new laws that mitigate punishment.  (*Padilla*, at p. 160; *Estrada*, *supra*, at p. 745.)  The *Estrada* court held that such laws are presumed to apply to cases charged before the law's enactment but that are not yet final.  (*Estrada*, *supra*, at p. 745.)  Absent evidence to the contrary, we presume that when the Legislature "'amends a statute so as to lessen the punishment,' it 'must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.'  (*Ibid*.)  Because the Legislature has 'determined that its former penalty was too severe,' the only reason to apply that penalty in pending cases would be 'a desire for vengeance,' a motivation we decline to attribute to our lawmakers."  (*Ibid*.; accord, *Padilla*, at p. 160.)

In *People v. Tran* (2022) 13 Cal.5th 1169, the California Supreme Court held Assembly Bill 333's amendments to section 186.22 altering the requirements necessary to prove the substantive gang offense and gang enhancements operate retroactively under the rule of *Estrada*.  (*Tran*, at p. 1206.)  The *Tran* court explained "*Estrada* 'stand[s] for the proposition that (i) in the absence of a contrary indication of legislative intent, (ii) legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date.'  [Citation.]  *Estrada* applies to statutory amendments 'which redefine, to the benefit of defendants, conduct subject to criminal sanctions.'  [Citation.]  Here, 'Assembly Bill 333 essentially adds new elements to the substantive offense and enhancements in section 186.22—for example, by requiring proof that gang members "collectively engage" in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang.…'  [Citations.]  These changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the

17.

enhancement,' with obvious benefit to defendants like Tran. [Citation.]" (*People v. Tran*, *supra*, at pp. 1206–1207.)

## B. Analysis

No case has yet addressed whether new laws, such as Assembly Bill 333, that change the elements of an offense or enhancement to a defendant's benefit apply retroactively to the showing necessary to hold a defendant to answer to the related charge or enhancement. Put differently, it has not yet been decided whether the evidence presented at a preliminary hearing that was sufficient to hold a defendant to answer under the old law should be sufficient to hold a defendant to answer despite the change in the law. Here, the parties agree the *Estrada* presumption should apply such that Assembly Bill 333's amendments to section 186.22 would apply retroactively to the showing required at the preliminary hearing. We, too, agree.

As discussed, absent evidence to the contrary, we presume that when the Legislature "'amends a statute so as to lessen the punishment,'" it "'must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.'" (*People v. Padilla*, *supra*, 13 Cal.5th at p. 160; accord, *Estrada*, *supra*, 63 Cal.2d at p. 745.) And, the California Supreme Court has held Assembly Bill 333 applies retroactively under *Estrada*. (See *People v. Tran*, *supra*, 13 Cal.5th at pp. 1206–1207.) We find no basis upon which to conclude Assembly Bill 333's changes to the elements of the gang-related offenses should not apply to the showing required at the preliminary hearing. Rather, Mendoza's case is not final and Assembly Bill 333's amendments are retroactive under *Estrada*. Therefore, its changes to the elements of the gang-related charges should be retroactive to the showing necessary to sustain the gang-related charges at the preliminary hearing.

Indeed, as provided in section 872, subdivision (a), a defendant shall only be held to answer where "it appears from the examination that a public offense has been committed, and there is sufficient cause to believe that the defendant is guilty." In

situations such as this, where a change in the law amends the elements of an offense, a defendant should only be held to answer where it appears from the preliminary examination that a public offense has been committed *under the new law*, since conduct under the old law may no longer constitute an offense. To hold otherwise would obviate the purpose of a preliminary examination and permit a defendant to be held to answer for an offense or enhancement for which the requisite showing has not been made.

Accordingly, we agree with the parties a defendant may seek the benefit of the change in the law by challenging the evidence presented at the preliminary hearing to hold the defendant to answer based on the change in the law.

## II.    Reopening of the Preliminary Hearing Proceedings Is Appropriate

The parties also agree the evidence at the preliminary hearing was insufficient to hold Mendoza to answer to the active gang participation charge and gang enhancements based upon the changes in the law, but they dispute the appropriate remedy. We conclude the prosecutor may move to reopen the preliminary hearing proceedings to present additional evidence on the amended elements of the gang-related charges or proceed without them.

### A.    Applicable Law

#### 1.    Sections 995 and 995a

Section 995 provides, in relevant part, upon a defendant's motion, an information shall be set aside where "the defendant had been committed without reasonable or probable cause." (§ 995, subd. (a)(2)(B); see *People v. Henson* (2022) 13 Cal.5th 574, 582.) "'"'Reasonable or probable cause' means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of guilt of the accused. 'Reasonable and probable cause' may exist although there may be some room for doubt."'" (*People v. Mower* (2002) 28 Cal.4th 457, 473; accord, § 872, subd. (a) [defendant shall be held to answer where "it appears from the [preliminary] examination that a public offense has been committed, and there is

19.

sufficient cause to believe that the defendant is guilty"].)  Accordingly, "section 995 allows a defendant to challenge an information based on the sufficiency of the record made before the magistrate at the preliminary hearing.  [Citation.]  In reviewing the denial of a … section 995 motion to set aside an information, we 'in effect disregard[] the ruling of the superior court and directly review[] the determination of the magistrate holding the defendant to answer.'  [Citations.]" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1071–1072.)

Assembly Bill No. 2984 added the remand procedure of section 995a, subdivision (b), which is at issue here.  The Assembly Committee on Criminal Justice, the Senate Committee on Judiciary, as well as the Legislature passed the bill unanimously in 1982.[4] (*Caple*, *supra*, 195 Cal.App.3d at pp. 600–601.)

Section 995a, subdivision (b)(1) provides that "[w]ithout setting aside the information" a court may, upon motion of the prosecuting attorney, "order further

---

[4]"As introduced, the bill would have added the following new subdivision (b) to section 995:  'Without setting aside the information, the court may, in its discretion, remand the cause to the committing magistrate for further proceedings, or itself sit as a magistrate and conduct further proceedings, which it deems appropriate, if the court finds that the errors alleged by the defendant could be expeditiously cured or corrected by further proceedings.  Any further proceeding held pursuant to this subdivision may include the taking of testimony and shall be deemed to be part of the preliminary examination.'

"As enacted, subdivision (b) of section 995a shows that Assembly Bill No. 2984 had been substantially amended.  The amendments (1) moved the remand provision from section 995 to section 995a; (2) permitted remand only 'upon motion of the prosecuting attorney'; (3) limited the remedy to 'minor errors of omission, ambiguity, or technical defect which can be expeditiously cured or corrected without a rehearing of a substantial portion of the evidence'; (4) permitted the superior court itself to 'sit as a magistrate' for the purpose of the further proceedings only if the parties agree; (5) required that the superior court, upon remanding to the original magistrate, state the perceived 'minor errors' in the remand order; (6) permitted recourse to the correction procedure only once with respect to any information; (7) provided that the correction proceedings shall not be deemed to extend the time within which a defendant must be brought to trial under … section 1382; (8) required that the superior court reserve its final ruling on the motion to set aside the information until the correction proceedings are completed; and (9) anticipated writ review if 'the [superior] court abused its discretion in utilizing the procedure set out in subdivision (b) of section 995a.…'" (*Caple v. Superior Court* (1987) 195 Cal.App.3d 594, 601, fn. 6 (*Caple*).)

20.

proceedings to correct errors alleged by the defendant if the court finds that such errors are minor errors of omission, ambiguity, or technical defect which can be expeditiously cured or corrected without a rehearing of a substantial portion of the evidence." That is, "[b]efore a trial court may institute further proceedings to correct preliminary hearing errors, section 995a requires it make two separate findings: (1) a minor error of omission, ambiguity or technical defect which, (2) can be expeditiously cured." (*Caple*, *supra*, 195 Cal.App.3d at p. 601; accord, *Garcia v. Superior Court* (2009) 177 Cal.App.4th 803, 814 ["section 995a, subdivision (b)(1) is reasonably understood as giving the court *discretion* to order further proceedings instead of setting aside an information but only if the … statutory prerequisites are met"].) "In cases in which the procedure set out in subdivision (b) of Section 995a is utilized, the court shall reserve a final ruling on the [section 995] motion [to set aside the information] until those procedures have been completed." (§ 995, subd. (b).)

### 2. *Principles Governing Remand Based Upon Change in the Law*

California courts have held, when a conviction is reversed because the evidence is now insufficient to support it based solely upon a change in the law that occurred after the defendant was convicted, retrial of that conviction is permitted and not barred by the double jeopardy clause. (See, e.g., *People v. Sek* (2022) 74 Cal.App.5th 657, 669 [reversing gang enhancements as a result of passage of Assem. Bill 333 and permitting retrial, reasoning "'[b]ecause we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial'"]; accord, *People v. Figueroa* (1993) 20 Cal.App.4th 65, 68, 72 [reversing enhancement in light of amendment to statute adding new element to it, and remanding to give People opportunity to prove up new element].) Such cases reason, "'""Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the

issue as one of sufficiency of the evidence.'"'"' (*People v. Sek*, *supra*, at pp. 669–670; accord, *People v. Monk* (2018) 21 Cal.App.5th Supp. 1, 8 [same]; *People v. Ramos* (2016) 244 Cal.App.4th 99, 103 [same]; *People v. Figueroa*, *supra*, at p. 72 [same].)

This conclusion follows from "'"a well-established part of our constitutional jurisprudence'"—"'[t]he principle that [the Double Jeopardy Clause] does not preclude the Government's retrying a defendant whose conviction is set aside because of an *error in the proceedings* leading to conviction.'" (*Burks v. United States* (1978) 437 U.S. 1, 14.) This is because "reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e.g.*, incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished." (*Burks*, at p. 15; see also *United States v. Tateo* (1964) 377 U.S. 463, 466 ["It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction"].)

Applying the principles articulated in *Burks*, the California Supreme Court in *People v. Shirley* (1982) 31 Cal.3d 18, held it was prejudicial error to admit testimony of a complaining witness who had undergone hypnosis for the purpose of restoring her memory of the events in issue, "but 'reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case.' [Citation.] Rather, the matter is governed by the settled rule that the double jeopardy clause does not prohibit retrial after a reversal premised on error of law. [Citations.]" (*People v. Shirley, supra,* at p. 71.) The *Shirley* court explained,

22.

the *Burks* rule "forbids retrial after a reversal ordered because the evidence introduced at trial was insufficient to support the verdict." (*Shirley*, at p. 71.) And, "[t]he rule achieves its aim—i.e., of protecting the defendant against the harassment and risks of unnecessary repeated trials on the same charge—by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity. (*Burks[ v. United States*, *supra*, 437 U.S.] at p. 11.) *But the incentive serves no purpose when*, *as here*, *the prosecution did make such a case under the law as it then stood; having done so*, *the prosecution had little or no reason to produce other evidence of guilt*." (*Ibid.*, italics added.)

### B.    Analysis

In his section 999a petition for writ of mandamus, Mendoza asserts the court erred in not dismissing the gang offense and enhancements. He argues the evidence at the preliminary hearing did not establish that the benefit of the current offense was anything more than reputational. He further contends the evidence failed to establish the 2013 predicate offense occurred within three years of the current offense and the 2015 predicate offense was not a valid predicate because it only involved one individual— Miguel Perez—but "a 'pattern of criminal gang activity' can only be established by showing that the predicate offense was committed by 'two or more members.'" He also contends there was no evidence either predicate offense benefitted the gang in a way that was more than reputational. He further argues the preliminary hearing failed to establish the Varrio Rexland Park gang was an ongoing and "organized" association.

Initially, he contended, "*[a]fter* vacating the offense and reversing the enhancements, [t]his Court should construe a remedy, which likely would entail allowing the [P]eople the opportunity to prove, at a preliminary hearing, the gang offense and enhancements." In his reply, however, Mendoza asserts "[i]t is premature for [the People] to suggest remanding the gang enhancements and offense pursuant to section 995a, subdivision (b) as the prosecutor has not yet filed a motion to do so." He argued

23.

"[t]he prosecutor may simply choose to proceed to trial without the gang enhancements and offense, or the prosecutor may not have sufficient proof for the gang enhancements and offense to proceed to fill in the missing evidence." He denies the missing evidence constitutes a "minor omission" such that a "mini preliminary hearing" was appropriate pursuant to section 995a, subdivision (b)(1). Rather, he argues the charges must be dismissed and the prosecution may refile them.

In their response to Mendoza's petition and to our order to show cause, the People concede Assembly Bill 333 applies to the showing necessary to hold Mendoza to answer to the gang enhancements and active gang participation charge, and they agree the evidence presented at the preliminary hearing did not meet all of the new section 186.22 requirements. Specifically, they agree the evidence was insufficient to establish the predicate offenses commonly benefitted the gang in a way that was more than reputational. They contend the petition should be granted in part and the matter remanded to allow them an opportunity to prove the active participation charge and the gang enhancement allegations based on the new statutory requirements. They contend "[o]ne viable remedy would be to permit the prosecution to make a motion under section 995a, subdivision (b)(1)." We conclude remand is appropriate for the court to permit the prosecution an opportunity to request to reopen the preliminary hearing proceedings and to present evidence on the new elements of the gang allegations or to choose to proceed without these charges.

First, we conclude the alleged deficiency in the evidence, which is based upon the amended elements of the gang-related offenses, should be considered a "minor error of omission" such that remand and further preliminary hearing proceedings are permitted pursuant to section 995a, subdivision (b)(1). In so concluding, we note the cases considering the language of section 995a, subdivision (b)(1) have emphasized "determining whether an omission is minor must be done on a case by case basis." (*Caple*, *supra*, 195 Cal.App.3d at p. 602; see *People v. Meza* (2011) 198 Cal.App.4th

24.

468, 473; accord, *Tharp v. Superior Court* (1984) 154 Cal.App.3d 215, 219, fn. omitted ["[F]inding a bright line of demarcation to provide courts with guidelines in applying section 995a is an impossible task. We therefore join those who came before us attempting to apply section 995a to particular facts"].)

The seminal case *Caple*, *supra*, 195 Cal.App.3d 594 held the term "minor omission" in section 995a, subdivision (b)(1) "refers to one that is *comparatively* unimportant." (*Caple*, at p. 602.) The *Caple* court reasoned "use of this meaning is consonant with the perceived legislative intent that meritorious prosecutions not be barred based upon minor omissions." (*Ibid.*) Accordingly, "an evidentiary defect will trigger the remand provisions of section 995a, subdivision (b)(1), whenever the omission is minor when considered in relation to the balance of the evidence required in order to hold the accused to answer." (*Ibid.*)

In *Caple*, the defendant was charged with possessing and transporting cocaine for sale. (*Caple*, *supra*, 195 Cal.App.3d at p. 597.) The evidence at the preliminary hearing established the defendant was seated within a foot and a half of the cocaine (which was found behind the driver's seat) and a partially burned marijuana cigarette was found in the ashtray. (*Id.* at. p. 598.) No other evidence was offered at the preliminary hearing to connect the defendant to the cocaine. (*Ibid.*) The defendant was held to answer and subsequently moved to have the charge set aside under section 995. (195 Cal.App.3d at p. 598.) The superior court remanded the matter to the magistrate for further hearing to allow the prosecution to introduce into evidence the accused's statement concerning ownership of the vehicle. (*Id.* at pp. 598–599.) In determining whether the alleged omission in the evidence was minor, the *Caple* court explained, "the quantum of proof needed to establish probable cause for the charged offenses must be kept in mind." (*Id.* at. p. 602.) The *Caple* court held the trial court acted properly in remanding the matter for the People to present additional evidence, reasoning, in part, "the omitted statement essentially required only one additional question and answer, it did not involve a

rehearing of any of the preliminary hearing evidence." (*Id*. at p. 603.) The court noted "the evidence already in the record at the time of the trial court's remand order provided most, if not all, of the evidence needed to hold Caple to answer for the charged offenses." (*Ibid*.) In reaching its holding, the *Caple* court declined to interpret the term "minor" in the statute to require an error to be "insignificant." (*Id*. at p. 601.) The *Caple* court reasoned such an interpretation "would totally eviscerate section 995a, subdivision (b)(1), by permitting its use only when the omitted evidence was unnecessary in the first instance." (*Id*. at p. 602.) But, "the Legislature did not intend the section to be so limited." (*Ibid*.)

In *Garcia v. Superior Court*, *supra*, 177 Cal.App.4th 803, the appellate court held the trial court erred in granting the People's request to reopen the preliminary hearing pursuant to section 995a, subdivision (b)(1), for the purpose of permitting the court, sitting as a magistrate, to hear new evidence before ruling on the defendant's motion to set aside the information, which alleged a felony violation of section 148. (177 Cal.App.4th at p. 806.) The *Garcia* court concluded "the trial court erred in finding that there was a minor and expeditiously curable omission" where the preliminary hearing transcript was "devoid of any evidence establishing the core conduct, or *actus reus*, of resisting arrest." (*Id*. at p. 814.) The *Garcia* court explained the court's ruling erroneously allowed "the prosecutor to present revised testimony in order to fill an evidentiary vacuum concerning the gravamen of the offense." (*Id*. at p. 806.)

Here, the additional evidence that has now become relevant to establish the necessary showing to support the active gang participation charge and gang-related enhancements as a result of the passage of Assembly Bill 333 was "comparatively unimportant" at the time of the original preliminary hearing proceedings. Indeed, it was not necessary then to proving the elements of the gang offense or enhancements. And, while the *Caple* court declined to interpret the term "minor" in section 995a, subdivision (b)(1) to mean the alleged error *must* be "insignificant" to support further proceedings

26.

under that section, we note in this instance, the omitted evidence *was* "insignificant" in that it "was unnecessary in the first instance." (*Caple*, *supra*, 195 Cal.App.3d at p. 602; see *People v. Meza*, *supra*, 198 Cal.App.4th at pp. 476–477 [court erred in denying request to reopen preliminary hearing proceedings pursuant to § 995a, subd. (b)(1) for prosecution to present evidence statute of limitations was tolled, concluding the alleged error was minor in that it did not relate to any element of the offense with which the defendant was charged, involve a substantive issue of guilt or innocence, and "did not go to the heart of the case and the evidence actually offered was sufficient to establish each element of the charged offenses" and error could be remedied by taking judicial notice of court file in prior proceeding].)

Furthermore, here, the prosecution presented a significant amount of evidence at the preliminary hearing that spanned multiple witnesses and two days of evidence to support six charges and multiple enhancements alleged against the three defendants. The additional evidence the People must produce to support the gang-related allegations is minor "considered in relation to the balance of the evidence required in order to hold the accused to answer." (§ 995a, subd. (b)(1).) Considering "the quantum of proof needed to establish probable cause for the charged offenses" (*Caple*, *supra*, 195 Cal.App.3d at p. 602), other enhancements, and allegations at the preliminary hearing, we conclude the omitted evidence, which the prosecution now seeks to present in further proceedings, is minor. It is true the additional evidence the People seek to present will be more extensive than what was necessary in *Caple* or *Meza*. Nonetheless, the omitted proof can be "expeditiously cured or corrected without a rehearing of a substantial portion of the evidence" (§ 995a, subd. (b)(1)) when considered in relation to the bulk of other relevant evidence already presented, given the particular facts of this case. Thus, remand in this situation is appropriate under section 995a, subdivision (b)(1).

This case is unlike the situation in *Garcia*, in which the prosecutor failed to present any evidence establishing the core conduct of the gang-related allegations during

27.

the preliminary hearing.  Rather, the parties do not dispute the People met their burden of establishing the requisite showing to support the gang-related allegations under the old law. Thus, reopening of the preliminary hearing proceedings in this context does not permit the prosecutor a second chance to fill "an evidentiary vacuum concerning the gravamen of the offense." (*Garcia v. Superior Court*, *supra*, 177 Cal.App.4th at p. 806.)

Furthermore, even assuming the language of section 995a, subdivision (b)(1) does not support reopening the preliminary hearing proceedings under the circumstances, the remedy we adopt is supportable as a rule of judicial procedure by application of the principles governing postconviction reversals based upon a change in the law.  (See § 1260 ["The court may … if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances"]; accord, *Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1254 [noting when error is shown, § 1260 gives appellate courts "the authority to select among several dispositions"]; see generally *People v. Gaines* (2009) 46 Cal.4th 172, 180 ["'Section 1260 evinces a "legislative concern with unnecessary retrials where something less drastic will do"'"].)  While, "'[h]istorically, trial courts have been prohibited from remanding felony prosecutions to correct errors in the commitment" (*Caple*, *supra*, 195 Cal.App.3d at p. 600; see *Tharp v. Superior Court*, *supra*, 154 Cal.App.3d at p. 219), here, neither party contends there was error in the original commitment of Mendoza before the law changed.  And, like the double jeopardy clause, the Legislature has limited the prosecutor's ability to have repeated opportunities to pursue the same charge, in part, to protect "the defendant against the harassment and risks of unnecessary repeated [proceedings] on the same charge—by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity." (*People v. Shirley*, *supra*, 31 Cal.3d at p. 71; accord, *Burks v. United States*, *supra*, 437 U.S. at p. 11; see § 1387, subd. (a) [precluding further prosecution in most instances "for the same offense" after dismissal "if it is a felony or … a misdemeanor charged together with a felony" and the action has been previously dismissed, or "if it is a misdemeanor

not charged together with a felony"]; *People v. Traylor* (2009) 46 Cal.4th 1205, 1209 ["A primary purpose of section 1387(a) is to protect a defendant against harassment, and the denial of speedy-trial rights, that result from the repeated dismissal and refiling of identical charges"]; *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1018 ["Section 1387 implements a series of related public policies. It curtails prosecutorial harassment by placing limits on the number of times charges may be refiled"]; see also *Burnett v. Superior Court* (1974) 12 Cal.3d 865, 873 [reopening of preliminary hearing not permitted to allow People to bolster case with additional testimony where magistrate erroneously found sufficient evidence to answer].) But, as with the double jeopardy clause, "the incentive serves no purpose when, as here, the prosecution did make such a case under the law as it then stood; having done so, the prosecution had little or no reason to produce other evidence of guilt." (*People v. Shirley*, *supra*, at p. 71.) The issue here, as in cases in which the law has changed postconviction, is not of insufficiency of the evidence. And further preliminary hearing proceedings should not be prohibited in such instances to permit the prosecution to prove new additional elements of an offense that go into effect after a defendant has been held to answer. (See *People v. Figueroa*, *supra*, 20 Cal.App.4th at p. 71 ["To say that appellant is now free of the enhancement would be to reward him with a windfall"].)

For all these reasons, we conclude the order holding Mendoza to answer on the substantive gang charge and gang enhancements must be vacated and the matter remanded. On remand, the prosecution may request to continue the preliminary hearing as stated herein. If the prosecution does not seek a continuation of the preliminary hearing or does not prove the gang allegations in conformity with the amended version of section 186.22 during the continued preliminary hearing, the case should proceed with an amended information without these charges.[5]

---

[5]Nothing in this opinion should be read to preclude Mendoza from being able to move to set aside the information pursuant to section 995 after the conclusion of the additional proceedings.

## DISPOSITION

Let a writ of mandate issue directing the respondent Kern Superior Court in case No. BF170463A to vacate the portion of the magistrate judge's order holding Mendoza to answer on the substantive gang charge (count 5) and gang enhancement allegations on counts 1 2, 3, and 4.  On remand, the prosecution may request to continue the preliminary hearing to prove the active gang participation offense and gang enhancements in compliance with the requirements of section 186.22, as amended by Assembly Bill 333.  Alternatively, the prosecution may elect to proceed on an amended information without the substantive gang charge and gang enhancement allegations.  We do not disturb the magistrate judge's order in any other respect.

PEÑA, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DESANTOS, J.